UNITED STATES of America, Plaintiff,

v.

Edwin W. EDWARDS, et al.,
Defendants-Appellees,

v.

TIMES PICAYUNE PUBLISHING COR-
PORATION, and Gannett News Servic-
es, Inc., et al., Movants-Appellants.

Nos. 86–3298, 86–3495.

United States Court of Appeals,
Fifth Circuit.

July 31, 1987.
Rehearing and Rehearing En Banc
Denied Aug. 31, 1987.

Jack M. Weiss, Mary Louise Strong, New Orleans, La., Lloyd J. Lunceford, Baton Rouge, La., for movants-appellants.

Marcel Livaudais, U.S. Dist. Judge, John Volz, U.S. Atty., New Orleans, La., for defendants-appellees.

Camille Gravel, Jr., Baton Rouge, La., for Edwards.

John Martzell, New Orleans, La., for Marion Edwards.

Risley Triche, Napoleonville, La., Joseph LaSage, Shreveport, La., for Mijalis.

Richard T. Simmons, Jr., Metairie, La., for Wyllie.

Michael Fawer, New Orleans, La., for Brooks.

Lewis O. Unglesby, Baton Rouge, La., for Isbell.

William Jeffress, Washington, D.C., Dennis R. Bagneris, New Orleans, La., for Falgout.

Thomas Rutter, Lafayette, La., for Segura.

Before WRIGHT,* GEE, and JOLLY, Circuit Judges.

GEE, Circuit Judge:

In today's case we find no first amendment violation in the closure of proceedings in which impaneled jurors were questioned about potential misconduct. We do con-

___

* Circuit Judge of the Ninth Circuit, sitting by designation.

clude that the first amendment guarantees the public and press a qualified right of access to the record of such proceedings. Concerning permissible restrictions on this right of access, we find no constitutional infirmity in the trial court's orders declining to release transcripts of the closed proceedings during trial and his order permanently sealing portions of the record containing jurors' names and portions concerning issues traditionally discussed in bench conferences.

## Facts

The appellants are three news organizations, the Times-Picayune Publishing Corporation, Gannett News Service, Inc., Capital City Press, and several of their reporters (referred to collectively as Times-Picayune). The adverse parties are the defendants named in the underlying action.

The press challenges proceedings and orders that arose during the second trial of Edwin Edwards and others for alleged racketeering and bribery. The first trial, a two and one-half month affair that generated much publicity, ended in a mistrial when the unsequestered jury was unable to reach a unanimous decision. In the second trial, the government moved that the jury be sequestered to protect it from "bias from outside influences." Besides the expected publicity, the first trial was tainted by rumors that jurors had been bribed.[1] The court ordered that the jury be sequestered in the second trial.

Nine days into the trial the marshal reported that juror C had informed him as follows: juror B had remarked to juror C, "Did you know the last jury got paid for voting acquittal." The court and counsel conferred on record in chambers about how to proceed. The judge, the prosecutor, and two of the defense counsel questioned each juror individually in chambers, beginning with B and C. Juror C reaffirmed the original report; Juror B flatly denied it, later offering the substance of a conversation between the two jurors that may have

been misconstrued by Juror C. During the course of these inquiries, the government suggested that they proceed in open court. The judge, urged by defense counsel, decided to continue informally in chambers, in order to encourage candor and to avoid intimidating the jurors. At the end of the proceedings, which lasted about two hours, motions to recuse were discussed. The judge determined that none of the jurors would be excused.

The press quickly filed an objection to this nondisclosure and to the lack of a preclosure hearing. Several hours later, without a hearing, the court ordered the record sealed and prohibited defense counsel and the prosecutor from making public comments about the issue. He explained only that the court had received a report that one juror had discussed "an aspect of the previous trial," and that motions to recuse jurors had been made and denied. He reasoned that nondisclosure was necessary "to preserve the impartiality of the jury," noting that "there is a possibility, however slight," that specifics would reach the jury. He cited an incident where marshals had already failed to cut out a small newspaper article in papers they had given to the sequestered jury.

Several days later, juror X reported to the matron that juror Y had confided that every time the jury was dismissed one of the defendants smiled and brought an envelope to Y's attention; Juror Y states he is extremely nervous about this but says he couldn't help out for less than $5,000.

An *in camera* conference similar to the first one ensued, followed by questioning of jurors X and Y in chambers. Over the objections of the "offending" defendant's attorney, the court denied a motion to recuse the jurors involved, characterizing the event as a "tempest in a teapot, a joke." The court issued an order, describing the incident as one in which a juror relayed that "a fellow juror commented about the actions of one of the defendants in the courtroom." The order states that after

---

**1.** Counsel informs us that, during the first trial, defense counsel heard a report that an acquittal vote was "going for $25,000." Also, the FBI received a letter that two jurors in the first trial had been compromised.

questioning of the jurors' motions to recuse were denied, concluding that the juror's comment was of a "joking nature." The transcript was sealed because of the "possibility of specifics reaching the jury given the circumstances surrounding sequestration." The order goes on to discuss the necessity of permitting some public activities for jurors during a lengthy sequestration.

The jury returned a verdict of not guilty as to all defendants. Shortly thereafter the Times-Picayune filed a motion seeking full and immediate access to the sealed record. Some two weeks later, after receiving opposition and reply motions, the district judge issued a final order.[2] He released redacted transcripts from which he had eliminated jurors' names, portions that included "comments made by counsel which are not part of the arguments to excuse," parts dealing with "procedural matters," and portions that "if released would be unnecessarily embarrassing to the jurors involved." He lifted the prohibition on public comment, except as to those matters remaining under seal.

Times-Picayune raises a first amendment challenge to 1) the closure of the proceedings 2) the midtrial orders sealing the record and imposing a ban on public comment about the proceedings during the trial 3) the lack of a hearing for the press before closure and before the court issued its midtrial orders, and 4) the post-trial order that permanently seals portions of the record, notably jurors' names. The defendant-appellees assert that neither the court's actions nor its orders violate the first amendment.

### The Law

We have jurisdiction under 28 U.S.C. § 1291. Insofar as any issue might be considered moot, the Supreme Court has determined that trial closure issues fall within that category of disputes that are "capable of repetition, yet evading review." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980); *see also United States v. Gurney*, 558 F.2d 1202, 1207 (5th Cir. 1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978).

Some background is helpful in following the parties' arguments. In *Richmond Newspapers, Inc.*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court recognized on behalf of the public and press a qualified first amendment right of access to criminal trials. Then in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Court declared unconstitutional a Massachusetts law mandating closure of trials concerning sex offenses against minors, requiring instead a case-by-case approach to justifying closure. In *Press-Enterprise Co. v. Superior Court of Cal.* (*Press I*), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Court held that the closure of all but three days of a six-week voir dire proceeding violated the first amendment. *Press II* followed. *Press-Enterprise Co. v. Superior Court of Cal.*, 478 U.S. ——, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). The proceeding at issue was a preliminary hearing, a procedure under the California penal code designed to determine whether there is probable cause to bind the defendant over for trial. That highly publicized case involved a nurse accused of killing patients with massive doses of a heart drug. The preliminary hearing took 41 days; only the prosecution presented evidence. The district court closed the proceedings and refused to release transcripts based on "a reasonable likelihood that release might prejudice the defendant's right

---

**2.** Shortly after the first incident, Times-Picayune filed an expedited appeal to this Court, which it later supplemented to challenge the judge's management of the second incident. A panel of this Court denied the emergency motion for expedited appeal and petition for writ of mandamus. Based on the record before it, which included the full transcript of the challenged proceedings, the panel found no error in the closure or ban on public comment. It added, however, that its ruling was without prejudice to further review, with more complete briefing and a potentially fuller record, adding that the trial court should at the first instance decide after trial whether to perpetuate his order. Order, *United States v. Edwards*, et al., No. 86–3298 (May 9, 1986).

to a fair and impartial trial." *Id.* at ——, 106 S.Ct. at 2739, 92 L.Ed.2d at 8. The Supreme Court held that the first amendment right of access to criminal proceedings extends to a preliminary hearing, that total closure of the prolonged hearing was insufficiently justified, and that it was therefore constitutionally infirm.

Following the principles in *Richmond, Globe,* and *Press I,* the Court in *Press II* recapitulated the two "complementary considerations" for determining whether a first amendment right of access attaches to the proceedings at issue: the court must determine (1) "whether the place and the process has historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at ——, 106 S.Ct. at 2740, 92 L.Ed.2d at 10.

*Press II* reaffirms the guiding principles: that although the first amendment right of access is not absolute, once the right to access attaches the presumption of openness can be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. *Id.* at ——, 106 S.Ct. at 2743, 92 L.Ed.2d at 13 (citing *Press I* and *Globe* ). Even though pretrial publicity posed a potential threat to the defendant's right to a fair trial, the *Press II* Court nevertheless recognized a presumption of openness concerning preliminary hearings and established that a preliminary hearing may be closed only if there are specific findings demonstrating a "substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent" and that "reasonable alternatives to closure will not protect" the defendant's right to a fair trial. *Id.*

### Attachment of the First Amendment Right of Access

We must first ascertain whether a first amendment right of access attaches. Times-Picayune argues that a first amendment right attaches here, characterizing the challenged proceedings as "supplemen-

tal voir dire" and relying on *Press I.* It asserts that we should look through the court's labeling of the procedures as "in chambers" conferences, as opposed to "trial proceedings," and perform a functional analysis. For example, in *United States v. Chagra,* 701 F.2d 354 (5th Cir.1983), we recognized a first amendment right to access to pretrial bail proceedings. In addition, the press argues, in *Rovinsky v. McKaskle,* 722 F.2d 197 (5th Cir.1984), our Court found that the defendant's sixth amendment right to a public trial was violated when the trial court conducted conferences in chambers to decide motions to limit the cross examination of two witnesses. In so doing, the Court ignored the "in chambers" label. Relying instead on first amendment access principles, the Court examined the "relationship of the issue at the hearing to the merits of the charge, the outcome of the prosecution and the *integrity of the administration of justice.*" *Id.* at 201 (emphasis added).

Times-Picayune points to the Supreme Court's explications of the values served by open proceedings. For example, openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press I,* 464 U.S. at 501, 104 S.Ct. at 819. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond,* 448 U.S. at 572, 100 S.Ct. at 2825. The press notes that in today's case this was the second trial in which the governor and his codefendants were charged with bribery. The first (mis)trial was tainted with rumors that the jurors were bribed. The alleged misconduct here was a juror's discussion of bribery and a juror's impression that a defendant was offering a bribe. This, the press argues, directly implicates public confidence, or lack thereof, in the integrity of criminal proceedings and thus invokes the values of openness.

Adverting to the same line of cases, the defendants contend that because this type of proceeding has not historically been open, no first amendment right of access attaches. Therefore, the first amendment

neither requires that this type of proceeding be conducted in open court, nor that the public and press obtain immediate and unfettered access to the record emanating from such proceedings.

*Analysis*

Our reading of precedent confirms that the Supreme Court has been careful to insulate this type of proceeding from unwarranted intrusion by the press and public. In *Richmond,* the Court recognized a presumption of openness concerning criminal trial proceedings, but the Court was careful to include this caveat:

> We have no occasion here to define the circumstances in which all or parts of a criminal trial may be closed to the public ... but our holding today does not mean that the First Amendment rights of the public and representatives of the press are absolute. Just as a government may impose reasonable time, place, and manner restrictions ... so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to trial. " '[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.

448 U.S. at 581 n. 18, 100 S.Ct. at 2830 n. 18 (quoting *Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941)).

In *Press I,* the Court cited this language with approval. 464 U.S. at 509 n. 10, 104 S.Ct. at 824 n. 10. In his concurrence in *Richmond,* Justice Brennan viewed the presumption of public trials as "not at all incompatible with reasonable restrictions":

> Thus, when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle. Nor does this opinion intimate that judges are restricted in their ability to conduct conferences in chambers, inasmuch as such proceedings are distinct from trial proceedings.

448 U.S. at 598 n. 23, 100 S.Ct. at 2839 n. 23.

The *Globe* Court cited this language with approval. 457 U.S. at 609 n. 25, 102 S.Ct. at 2621 n. 25. Our own court has explicitly acknowledged that bench conferences are outside public hearing and the protection of their privacy is generally within the court's discretion. *Gurney,* 558 F.2d at 1210 (citing *United States v. Nixon,* 418 U.S. 683, 714, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974)).

This sort of discretion historically extends to "jury matters." In *Gurney,* we affirmed that the press had no right of access to written communications between the judge and jury during deliberations; neither were they entitled under the first amendment to a list of jurors' names and addresses. *Id.* In a case involving restrictions on the press concerning their interviewing of discharged jurors, we stated: "A federal judge is not the mere moderator of a jury trial; he is its governor for the purpose of insuring its proper conduct." *United States v. Harrelson,* 713 F.2d 1114, 1117 (5th Cir.1983) (citing *Herron v. Southern Pacific Co.,* 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931)). We reconfirmed in *Harrelson* that the trial court is accorded broad discretion, "based on law and on his own and common experience," over aspects of the trial concerning the "handling of jurors," e.g. sequestration, juror access to information, and "harassment of jurors." *Id.* at 1117.

It is clear from the outset, however, that the values of openness are implicated in today's case. The issue of potential juror misconduct goes to the very heart of public confidence in the fairness or appearance of fairness in judicial proceedings. Once the spectre of a tainted jury is raised, public scrutiny of the resolution of the issue is essential, especially when, as here, the jury acquits. Applying the Supreme Court's test of "experience and logic" thus leads us, not to a facile answer, but to a quandary: the values of openness are significantly implicated in jury misconduct matters, yet the management of such matters, including control over the place and manner in which "jury" proceedings are conducted, has his-

torically been subject to the broad discretion of the trial court.

We turn to functional considerations for an answer. Experience and logic do indeed provide the reasons why midtrial proceedings involving the questioning of jurors have traditionally been closed to the public: holding such proceedings in open court would itself introduce an element of bias and would substantially raise the risk of destroying the effectiveness of the jury as a deliberative body. Whenever one juror reports the potential misconduct of another, the jury as an institution is instantly cast in jeopardy. It is vitally important to all parties, and it is the duty of the court, to ascertain whether the "offending" juror is biased and whether a taint of bias has affected other jurors. This process is different in several respects from the other types of proceedings found by the high court to be presumptively open—differences not of degree, but of kind. Wrenched from their neutral posture, the jurors themselves are suddenly cast on the defensive, facing counsel who are now their cross-examiners, a most difficult situation for all. During voir dire of potential jurors, counsel is armed both with challenges for cause and with peremptory challenges; counsel can probe to elicit indications of bias. Here, the jury, with a limited number of alternates, is fixed.[3] At the risk of alienating sitting jurors, counsel must delicately ascertain whether bias now infects one or more of them, a task made doubly difficult when the juror accused flatly denies the claim. This process itself

can create undesirable bias against the defendants whom counsel represent. The deleterious effects can only be exacerbated by requiring jurors to "defend" themselves in open court. As the process takes on an adversarial nature, counsel will likely demand recusals, even of those jurors whom they believe were not biased before the proceeding. The potentially divisive effects on relationships between jurors would be exacerbated by a "public hearing." If involved jurors are retained, the reservoir of goodwill between jurors, so important to reaching group consensus, is drained, thus increasing the potential that deliberations will end with a hung jury. If involved jurors are retained and the jury does convict, the defendant will almost surely contend on appeal that his sixth amendment right to a fair trial was violated.[4]

If the questioning of impaneled jurors were held in open court, there is a substantial probability that what may have begun as a "tempest in a teapot" will end in a mistrial, a hung jury, or a reversal on appeal. The interest in preserving the jury as an impartial, functioning, deliberative body is not only a higher value than that served by openness here, it is a *sine qua non* of our system of criminal justice as envisioned in the sixth and seventh amendments. Thus, for first amendment purposes, no presumption of openness attaches to proceedings involving the midtrial questioning of jurors. It follows that the trial judge did not err in failing to provide a preclosure hearing.[5]

3. We note in passing that one juror had already been excused before these incidents occurred.

4. A First Circuit case illustrates. In *United States v. Corbin*, 590 F.2d 398 (1st Cir.1979), one juror reported that she had heard another juror state "He's guilty, he's guilty." The judge, with counsel present, questioned all jurors under oath. The offending juror vigorously denied having made the statement. Satisfied that the other jurors had not heard anyone make such a comment, the court found that the offending juror did not make the comment, but nevertheless took the step of excluding him from the jury, "in order to do whatever can be done, short of starting all over again next year, to rid the jury of any possible taint." The defendant, who was eventually convicted, challenged the court's failure to declare a mistrial, asserting

that the court's investigation and findings were insufficient.

As this Court noted in *Harrelson*, while it is possible for the trial court to act with undue restrictiveness in jury matters, it is also possible for him to be too lax and to suffer reversal for that reason. 713 F.2d at 1117.

5. In so holding, we do not foreclose the possibility that the first amendment, under circumstances not presented in today's case, might require that proceedings involving the questioning of jurors be held in open court. We find no factors here, nor reasonable alternatives to closure, that would effectively mitigate the negative effect that open proceedings would have on the functioning of the jury as an institution. We note in passing that, to sustain a first

## Disclosure of Transcripts

We find in *Press I* a framework for accommodating the values served by public access and the practical necessities of judicial administration of jury trials. In *Press I*, a rape case, the district court closed voir dire because he anticipated that jurors would be asked highly personal questions. The Supreme Court found unconstitutional the prolonged and total closure of the 41-day voir dire process. The Court noted however that a trial judge may "in the interest of the fair administration of justice, impose reasonable limitations on access." 464 U.S. at 511 n. 10, 104 S.Ct. at 824 n. 10.[6]

The Court suggested a reasonable alternative to accommodate all competing interests: "When limited closure is ordered the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time." 464 U.S. at 512, 104 S.Ct. at 825.

██ Likewise, in today's case the availability of the transcript is the key to satisfying the constitutional values of public scrutiny. We conclude that the first amendment guarantees a limited right of access to the record of closed proceedings concerning potential jury misconduct and raises a presumption that the transcript of such proceedings will be released within a reasonable time.

amendment challenge, factors must exist to demonstrate that open proceedings would play a "significant positive role" in the functioning of the particular proceedings in question. *Press II*, 478 U.S. ——, 106 S.Ct. at 2740, 92 L.Ed.2d at 10.

It follows that, if such factors are timely brought to the trial court's attention, a preclosure hearing may be warranted. The practical difficulties of holding a hearing may, of course, preclude that possibility, as in the circumstances presented here.

The report of potential "jury misconduct" was precipitously presented to the trial judge. The proceedings that ensued were not analogous to the scheduled proceedings at issue in *Richmond* and its progeny, where the judge could question counsel to ascertain the anticipated contents of the proceedings. Here, the content and course

## Disclosure Within a Reasonable Time

Times-Picayune argues that release must be contemporaneous, relying on *Associated Press v. United States District Court*, 705 F.2d 1143 (9th Cir.1983). In that case, the Ninth Circuit held that the across-the-board sealing, albeit for only 48 hours, of all pretrial documents was impermissible. We note, however, that the constitutional violation in *Associated Press* rested on the lack of a showing sufficient to justify the blanket order sealing *all* documents, the availability of less restrictive alternatives, and the improbability that the closure orders would have any significant positive effect, given the extensive and continuing pretrial publicity in that case. The gravamen of the constitutional infirmities found in *Associated Press* are far afield from our inquiry, which addresses the timing of the (already-presumed) disclosure of the record.

The press contends that the first amendment mandates midtrial disclosure, because sequestration is sufficient to protect the jury from exposure to publicity. To the contrary, we conclude that, despite sequestration, midtrial publicity does continue to threaten the impartiality of the jurors. We previously noted the special volatility of publicity when it is focused, not on the merits of the case, but on the jurors themselves. If the substance of such incidents is played out in the press during trial, the difficulty is in insulating the jurors, not merely from media reports, but from re-

of development of the proceedings were unknowable. Both sets of proceedings were confined to the questioning of jurors only; each inquiry lasted less than two hours, consuming less than four hours of time in a six-week trial. In these circumstances, there is no need for the court to halt the proceedings to provide a midcourse discussion of reasonable alternatives to closure.

**6.** The *Press I* Court again reiterated that the question is "whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." 464 U.S. at 511 n. 10, 104 S.Ct. at 824 n. 10 (citing *Richmond*, 448 U.S. at 581–82 n. 18, 100 S.Ct. at 2830 n. 18).

marks offered by others. As the district court noted, even when jurors are sequestered they are by necessity exposed to outsiders, from family members to fellow patrons in the doctor's office. The jurors are under a duty to report all untoward exposure to external information. Dutiful reporting by jurors necessitates further questioning in chambers, which leads to further media reports, from which all twelve jurors must be insulated. What may have begun as sound and fury can degenerate into a comedy of errors, only one of which need be harmful for the jury trial to be rendered a nullity.

Weighing against these difficulties are the values of prompt release. We recognize the worth of timely news reported on the front page and, by contrast, the diminished value of noteworthy, but untimely, news reported on an inside page. Implicit in that assessment, however, is the fair assumption that significant news will receive the amount of publicity it warrants. The value served by the first amendment right of access is in its guarantee of a public watch to guard against arbitrary, overreaching, or even corrupt action by participants in judicial proceedings. Any serious indication of such an impropriety, would, we believe, receive significant exposure in the media, even when such news is not reported contemporaneously with the suspect event.

■ The issue, simply stated, reduces to "Better sooner than later"? Given the paramount interest in maintaining an impartial jury, and its inherent vulnerability, we find no error in the district court's refusal to release transcripts of the closed proceedings before the jury reached its verdict. The trial court should nevertheless avoid unnecessary delay in releasing the record of closed proceedings after trial. When a motion is made for release of transcripts, the trial court should anticipate their probable post-trial disclosure and endeavor to release them as soon after verdict as possible.

### Procedural Protections

In requiring a case-by-case resolution of the issues concerning closure of presump-tively open proceedings, the *Globe* Court noted that, for this approach to be effective, "the press and general public must be given an opportunity to be heard on the question of their exclusion." 457 U.S. at 610 n. 25, 102 S.Ct. at 2621 n. 25. *Press II* requires, if closure of a presumptively open proceeding is to withstand a first amendment challenge, that the court make specific, on-the-record, factfindings demonstrating that a substantial probability exists that an interest of a higher value will be prejudiced and that no reasonable alternatives to closure will adequately protect that interest. 478 U.S. ——, 106 S.Ct. at 2743, 92 L.Ed.2d at 13–14.

■ Similarly, if the presumption that transcripts will be released is to be effective, once the press files a motion for disclosure, it must be given a meaningful opportunity to be heard before any contrary decision is made. *See e.g., In re Washington Post Co.*, 807 F.2d 383 (4th Cir.1986). Pursuant to *Press II*, if the judge denies post-trial disclosure of the requested transcript, he must make specific, on-the-record factfindings demonstrating a substantial probability that higher values will be prejudiced and that reasonable alternatives cannot adequately protect those values.

■ We do not, however, imply that the court must hold a hearing and write redundant findings of fact that merely reiterate truisms. *See Harrelson*, 713 F.2d at 1117 (that the court held no unnecessary hearing to establish that the press is "tenacious in pursuing information" did not render invalid the order restricting press interviews of jurors). For example, as discussed below, the redaction of jurors' names in the circumstances presented here was justified; the court's excision of portions of the record comprising bench or *in camera* conferences is within its discretion and need not be the subject of a hearing. *See Gurney*, 558 F.2d at 1210 ("Such conferences are an integral part of the internal management of trial and screening them from access by the press is well within a trial judge's broad discretion.) The unredacted

transcripts are, of course, subject to this Court's appellate review.

### Redaction of Transcripts

The *Press I* Court instructed that redaction of juror names or portions of the transcript may constitute a reasonable alternative to safeguard jurors from unwarranted embarrassment and yet preserve the competing interests served by disclosure.[7] Times-Picayune notes that in *Press I* the Court was concerned with the potential embarrassment to jurors that would stem from public discussion of highly personal attitudes, and perhaps experiences, concerning sex and rape. The jurors here expressed discomfort about betraying confidences shared with them by other jurors. Times-Picayune argues that this "minor discomfort" of jurors does not warrant the level of solicitude afforded the jurors in *Press I*. Thus, they assert, the permanent redaction of the jurors's names in the transcripts was error.

■ We disagree. The usefulness of releasing jurors' names appears to us highly questionable. The transcripts will reveal the substance and significance of the issues. Had the jury deliberations resulted in conviction, the issue of juror bias would inevitably have been appealed, with the unexpurgated transcript available as a matter of record. Had the government seriously suspected that a particular juror had been compromised, and had those suspicions been substantiated, collateral proceedings subject to the full gamut of first amendment challenges would follow. In *Gurney*, 558 F.2d 1202 (5th Cir.1977), we held that the trial judge's refusal to release the names and addresses of jurors violated no first amendment right of access. Our Court has recognized that, although post-

trial restrictions on news gathering must be narrowly tailored, the jurors are entitled to privacy and protection from harassment even after completing their duties. *In re Express News*, 695 F.2d 807 (5th Cir.1982). In *Harrelson*, 713 F.2d 1114 (5th Cir.1983), the press raised a first amendment challenge to the court's post-trial motion that prohibited the press from making repeated interview requests once a juror has refused, and from inquiring into a specific vote by a juror other than the juror being interviewed. We find no intervening decisions by the Supreme Court that overrule these cases. Moreover, Times-Picayune raises no issue concerning post-trial restrictions on its ability to interview jurors after the trial. We find no error in the court's refusal to release jurors' names in the transcript.[8]

AFFIRMED.

---

7. The Court stated, in pertinent part:
"When limited closure is ordered the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time," if the judge determines that disclosure can be accomplished while safeguarding the jurors' valid privacy interests. Even then, a valid privacy right may rise to a level that part of the

transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment."
*Press I*, 464 U.S. at 512, 104 S.Ct. at 825.

8. We have reviewed the full transcript of the closed proceedings and conclude that the excised portions are within the gamut of issues discussed in bench conferences. We find no error in the court's redaction of the transcripts.