**PHOENIX NEWSPAPERS, INC., an Arizona corporation; KPNX Broadcasting, Petitioners,**

v.

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, Respondent.**

**United States; John Fife Symington, III, Real Parties in Interest.**

**No. 97–71119.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 1998.

Decided Sept. 14, 1998.

---

942

David J. Bodney, Peter B. Swann, Steptoe & Johnson, LLP, Phoenix, AZ, for Petitioners.

George Cardova, David J. Schindler, Asst. U.S. Attys., Los Angeles, CA, for Real Party in Interest, U.S.

Before: HUG, Chief Judge, FERNANDEZ and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

Phoenix Newspapers, Inc. and KPNX Broadcasting Co. (collectively, "the Press") petition for a writ of mandamus challenging the district court's order sealing the transcripts of hearings conducted during jury deliberations in a criminal trial. We hold that the district court erred by denying access to the hearing transcript without complying with the procedural and substantive requirements for sealing the record from the public.

## I

On May 13, 1997, the criminal jury trial of John Fife Symington, the sitting Governor of Arizona, began. During the approximately three full months of the trial and thereafter, the case received extensive media coverage. On August 8, 1997, the case was sent to the jury, which deliberated for three and a half weeks before returning a guilty verdict on seven counts of fraud on September 3, 1997.

On August 22, 1997, in the midst of jury deliberations, the district court conducted two hearings to investigate the reports of two jurors and Symington's secretary that they had received threatening telephone calls during the previous night. At the beginning of the first hearing, the court announced that because the hearing dealt with "a matter relating to security issues," the proceeding would be closed and sealed. During this hearing, Carol Henderson, Symington's secretary, testified that during 8:15 and 8:30 p.m. the previous evening, while she was dining at her home with John Dowd, Symington's attorney, she had received a telephone call from an unidentified man who had addressed her by name and said, "If Fife goes down, you get $10,000. If he goes free, you die." In addition, Juror No. 114 reported that at approximately 8:15 p.m. the previous evening, she too had received a telephone call from a male stranger who had said, "[E]ither

[Symington] will get the death penalty or you'll get the death penalty." She subsequently contacted the police and told them that the voice on the telephone had sounded like Dowd's. However, after the court had assured her that Dowd could not have made the telephone call, she affirmed that the call would not affect her ability to perform as a juror. Finally, Juror No. 105 described the telephone call she had received the previous night, during which an unidentified man addressed her by name and said, "Fife goes free, you get ten grand." She stated that the call would not affect her ability to weigh the evidence in the case. Both jurors received assurances that the investigation of these telephone calls would be deferred until after the jury had completed its deliberations. The court also informed both jurors that it planned to ask in open court whether any juror had encountered difficulties in abiding by the admonitions regarding media coverage or had been contacted by anyone outside the jury. The court told the two jurors that they did not need to respond to this open-court inquiry as the communications they had received had already been investigated, an instruction both jurors duly heeded.

In response to the closure of this hearing, the Press filed a motion that same day for access to the proceeding and for an expedited hearing thereon. The Press argued that the court had failed to issue specific findings justifying closure of the hearing. At the end of the first closed hearing, the district court heard argument on the Press's motion in an open hearing and reiterated its intention to seal the transcript of the closed hearing. In addition, the court asserted that it would close and seal the second hearing addressing the threatening telephone calls. In support of its decision, the district court explained:

The proceeding this morning, and indeed the proceeding that will resume at 1:00 o'clock is a matter that brings security issues to the Court's concern. And it is for that reason that the proceeding is closed and sealed.

The security—the nature of the security interest is what forms the basis and rationale and reasoning for the closure. It is related to the fair administration of the

trial and to the processes that are ongoing in the trial. And so in a sense, it is both security issues and the interest that the Court has in assuring a fair and orderly judicial process in this trial.

It is the Court's belief, and therefore its finding that not holding this proceeding that we held this morning and the one that is contemplated for 1:00 o'clock today, if they—if those proceedings were not held in closed session, it is the Court's belief and thus its finding that matters of security and issues relating to the security issues that were brought to the Court's attention this morning could be jeopardized as well as the fair administration of the case and its proceedings that are now ongoing in the absence of closure.

The Court has not been able to determine an alternative for closure.... [W]hen we talk about alternatives, ofttimes that has come up in cases where there might well be differing ways in proceeding, either by sequestering juries or by changing venue or by engaging in other procedures that would safeguard the fundamental interest at stake, but, nonetheless, not require closure.

The court also conceded that it may not have employed the "appropriate techniques" to resolve the issue of the closure of the first hearing before the hearing occurred, in light of Ninth Circuit case law and the First Amendment. Hence, the court pledged that in future, it would always give the media an opportunity to inquire about alternatives to closure of a proceeding before the proceeding actually took place.

On the afternoon of the same day, the court conducted a second closed hearing to investigate the telephone threats. At the beginning of this hearing, the court declared:

This proceeding is closed because it is a matter relating to security and relating to the orderly administration of the trial. And those two issues the Court finds are inextricably interwound and the Court is unable to determine any reasonable alternative to closure and the proceedings of this nature simply don't lend themselves to any of the more traditional alternatives that can generally be used to maintain the openness of the process.

In relevant part, this hearing examined the tape recording of the police's interview with Juror No. 114 and considered the possibility of divulging information to the Press concerning the nature of the hearing. Both the prosecution and the defense agreed that it was sufficient for the court to state that the hearing pertained to a security issue. Similarly, both sides agreed that sequestering the jury would be unnecessary.

During that same afternoon, the Press filed a supplemental motion seeking specific findings about the basis for the court's closure order and requesting the unsealing of the transcript of the closed hearing. On August 25, 1997, the court conducted an open hearing on this motion and took it under submission. On September 4, 1997, a day after the jury's verdict, the Press filed a second supplemental motion repeating its claim that the court had failed to offer "constitutionally adequate findings" to support closure and requesting release of the August 22, 1997 transcript.

On September 5, 1997, the district court issued an order denying the Press's motions. In this order, the court found that "the interest in ensuring the security of individuals associated with this trial" was compelling, and that the sealed proceeding was not the kind "traditionally ... conducted in open fashion." The court also observed that there was a "substantial probability" that this compelling interest would suffer in the absence of closure, "because the steps taken to ensure the security of the individuals associated with the trial could very well be thwarted." According to the court, no alternatives to closure existed "that would adequately protect this compelling interest." Without specifying a date, the court anticipated that at some juncture in the future, unsealing the transcript and minute order of the proceeding might become appropriate.

In response, the Press filed its petition for a writ of mandamus on September 24, 1997. On October 2, 1997, the district court issued a minute order releasing a portion of the August 22, 1997 transcript dealing with an issue distinct from the matter of the juror

threats. In a second sealed minute order issued the same day, the court noted:

> The Court has been advised that the investigation is ongoing and that it is in a posture that the disclosure of the transcript [of the August 22, 1997 hearings] would constitute a serious risk of compromising the investigation. As a result of the status of the investigation, the transcript remains sealed.

On October 15, 1997, Symington's counsel moved to unseal the August 22, 1997 transcript. He explained that because the media had obtained the police report relating to the juror threats through a public records request, there was no reason to keep the transcript sealed. In addition, while the police report contained Juror No. 114's statement that the threatening caller had sounded like Symington's counsel, the August 22, 1997 hearings had elicited the information that counsel could not have made the call. Symington's counsel asserted that the release of the transcript "would help resolve the false and erroneous allegation contained in the police report," and that preserving the transcript under seal would inflict "irreparable injury" upon him. Accordingly, after conducting a conference on October 15, 1997 and finding that the government did not object to the motion to unseal the transcript, the court granted this motion. The court also issued a minute order requiring that the transcript, redacted to conceal telephone numbers and addresses, be made available to the media "within the hour."

On October 22, 1997, the government lodged its opposition to the Press's petition for writ of mandamus. In its October 28, 1997 reply, the Press maintained its petition, arguing that 1) the district court did not make, nor could it make, constitutionally adequate findings in support of its order to close the August 22, 1997 hearings and seal the hearing transcript; 2) the petition was not moot, because it involved constitutional violations that were capable of repetition while evading review; and 3) the Press enjoyed a First Amendment right of access to the August 22, 1997 proceeding.

As originally framed, the Press's petition requested us to hold that the Press enjoyed a First Amendment right of access to the August 22, 1997 hearings. However, during oral argument before this Court, the Press withdrew its primary contention that it had a First Amendment right of access to the hearings themselves. We accordingly decline to reach that issue, but instead confine our analysis to the Press's argument that it had a First Amendment right of access to the transcript of the hearings. Thus, the sole question remaining in this appeal is the appropriateness of the district court's post-trial order denying access to the transcripts.

■ We have jurisdiction pursuant to 28 U.S.C. § 1651, and review de novo whether the Press has fulfilled the requirements for the issuance of a writ of mandamus. *Seattle Times v. United States Dist. Court,* 845 F.2d 1513, 1515 (9th Cir.1988).

## II

■ Notwithstanding the district court's release of the transcripts on October 15, 1997, the question presented by this appeal is not moot because it presents an issue that is "capable of repetition while evading review." *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 6, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (citation omitted) (*"Press–Enterprise II "*). For the petition to come within this exception to mootness, there must exist a "reasonable expectation" that the Press will again be subjected to the same injury, and the Press's injury must be of a type intrinsically limited in duration, such that it could not be fully litigated in federal court. *See Cammermeyer v. Perry,* 97 F.3d 1235, 1238 (9th Cir.1996). The Press's petition fulfills both of these requirements.

First, the United States Supreme Court has deemed the short duration of criminal trials to be sufficient to satisfy the "evading review" requirement for closure orders such as those at issue here. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 563, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) ("More often than not, criminal trials will be of sufficiently short duration that a closure order will evade review, or at least considered plenary review in this Court.") (citation and internal quotation marks omitted).

Second, the Press's petition raises an issue that is "capable of repetition" because "[i]t can reasonably be assumed" that the Press, as representatives of the news media, will be subjected to similar closure orders in the future. *See, e.g., Press–Enterprise II,* 478 U.S. at 6, 106 S.Ct. 2735 (concluding that petitioner, member of news media, met "capable of repetition" component of exception to mootness). While we have not previously addressed the particular constellation of facts that is at issue here, the government proves too much in arguing that this fact in itself pushes the instant case outside the "capable of repetition" requirement: the mere fact that a case presents a hitherto unexamined set of circumstances has prevented neither the United States Supreme Court nor this Court from reaching the merits of the case. *See id.; Sacramento Bee v. United States Dist. Court,* 656 F.2d 477, 480–81 (9th Cir. 1981) (finding that case was not moot although it raised "an important issue of first impression"). Accordingly, we turn to the merits of the Press's petition.

### III

■ One of the most enduring and exceptional aspects of Anglo–American justice is an open public trial. Indeed, "throughout its evolution, the trial has been open to all who cared to observe." *Richmond Newspapers,* 448 U.S. at 564, 100 S.Ct. 2814. The press and the general public have a constitutional right of access to criminal trials. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 603, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1981). As Chief Justice Burger explained in *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I* "):

> The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness

thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

■ In addition to a constitutional right of access to criminal trials, "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial documents and records." *Nixon v. Warner Communications,* 435 U.S. 589, 597, 98 S.Ct. at 1312, 55 L.Ed.2d 570 (1978). Indeed, there is a strong presumption in favor of the common law right to inspect and copy judicial records. *Valley Broadcasting Co. v. United States Dist. Court,* 798 F.2d 1289, 1294 (9th Cir.1986)(citing *United States v. Edwards,* 672 F.2d 1289, 1294 (7th Cir.1982)).

■ Of course, there is no right of access which attaches to all judicial proceedings, even all criminal proceedings. *See, e.g., Times Mirror Co. v. United States,* 873 F.2d 1210, 1217 (9th Cir.1989) (no right of access to pre-indictment warrants). Thus, although we begin with the "presumed right of access to court proceedings and documents," *See Oregonian Publishing Co. v. United States Dist. Court,* 920 F.2d 1462, 1465 (9th Cir. 1990), the United States Supreme Court has articulated a two-part test, known as the "experience and logic" test, for determining whether a right of access attaches to a particular kind of hearing. *Id.*

■ The "experience" prong of the test questions "whether the place and process have historically been open to the press and general public," *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. 2735, while the second element inquires "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* If a proceeding fulfills both parts of the test, a qualified First Amendment right of access arises, to be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." The trial court must articulate this interest "along with findings specific enough that a reviewing court can determine wheth-

er the closure order was properly entered." *Id.* at 9–10, 106 S.Ct. 2735.

In *Oregonian,* we applied the *Press–Enterprise II* test to determine whether the presumed right of access extended to plea agreements and related documents in criminal cases. After finding that plea agreements have traditionally been open to the public, and that denying access to plea agreements would thwart "the public's access to a significant segment of the criminal justice system," we concluded that a qualified right of access attached to plea agreements and related documents. *Oregonian,* 920 F.2d at 1465–66.

In assessing the historic access afforded the public, we must be careful not to conflate the questions of the right to attend a closed proceeding, and obtaining a post-trial transcript of the hearing. The two are not synonymous, for the rationale for closing a proceeding, such as infringement of the defendant's right to a fair trial, may have no bearing on a decision to seal forever the content of in camera proceedings. Although the issue of whether the public or press has any historical qualified right to attend closed trial proceedings is an interesting one, and subject to some debate, it is not before us.

■ The issue to which our attention is directed is post-trial transcript access. There are no precise antecedents in English common law, for the Anglo–Saxon tradition eschewed closed trial proceedings.[1] "Indeed, there is little record, if any, of secret proceedings, criminal or civil, having occurred in known English history." *Gannett Co. v. DePasquale,* 443 U.S. 368, 420, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)(J. Blackmun, concurring). "[N]ot even the Court of Star Chamber, the name of which has been linked with secrecy, conducted hearings in private." *Id.*

However, as American jurisprudence has evolved, the use of bench conferences and in camera proceedings has proliferated. Thus, we must gauge the treatment of transcript

access in the context of its development in the United States. Historically, post-trial transcript access has been granted as soon as the factors which prompted hearing closure have been resolved. For example, in *Gannett,* a case in which the Supreme Court approved of an exclusion order, the court noted:

> Furthermore, any denial of access in this case was not absolute, but only temporary. Once the danger of prejudice had dissipated, a transcript of the suppression hearing was made available. The press and the public then had a full opportunity to scrutinize the suppression hearing. Unlike the case of an absolute ban on access, therefore, the press here had the opportunity to inform the public of the details of the pretrial hearing accurately and completely. Under these circumstances, any First and Fourteenth Amendment right of the petitioner to attend a criminal trial was not violated.

443 U.S. at 393, 99 S.Ct. 2898.

Similarly, in *U.S. v. Edwards,* 823 F.2d 111 (5th Cir.1987), the Fifth Circuit held that "no presumption of openness attaches to proceedings involving the midtrial questioning of jurors" regarding their alleged misconduct, *see id.,* 823 F.2d at 117, but nonetheless discerned "a limited right of access" to these closed proceedings that "raise[d] a presumption that the transcript of such proceedings [would] be released within a reasonable time." *Id.* at 118.

Our circuit has clearly held that transcripts of public trial proceedings must be released when the factors militating in favor of closure no longer exist. In *United States v. Brooklier,* 685 F.2d 1162, 1172 (9th Cir. 1982), we stated:

> Even where denial of access is appropriate, it must be no greater than necessary to protect the interest justifying it.... Thus, transcripts of properly closed pro-

---

1. Under English common law, the press had no privilege to disseminate pre-trial proceedings because of the potential taint on the jury. *See Gannett,* 443 U.S. at 389 n. 20, 99 S.Ct. 2898 [citing *King v. Fisher,* 2 Camp. 563, 170 Eng. Rep. 1253 (N.P.1811)]. Although publicity "be-

came intrinsically associated with the sittings of the royal courts," *see id.* at 420, 99 S.Ct. 2898 (Blackmun, concurring), the fact that all trial proceedings were open provides little assistance in a historic analysis of access to closed proceedings during trial.

ceedings must be released when the danger of prejudice has passed.

Thus, consistent with history, case law requires release of transcripts when the competing interests precipitating hearing closure are no longer viable.[2]

■ Even if the historic right of post-trial access were not dispositive, the "logic" prong of the *Press–Enterprise II* formulation would be. Under the second analytic tier, we "determine whether public access ... would serve as a curb on prosecutorial or judicial misconduct or would further the public's interest in understanding the criminal justice system." *Oregonian,* 920 F.2d at 1465.

It is difficult to imagine a circumstance in which maintaining public trust in the integrity of the judicial process is more crucial than in the criminal trial of a public official. The actions of an indicted elected official, conduct of the law enforcement agencies and the comportment of the trial judge all "combine to create legitimate public interest in the proceedings far beyond the usual criminal trial." *United States v. Criden,* 648 F.2d 814, 822 (3d Cir.1981). Under such circumstances, it is critical to assure that "justice may not be done in a corner nor in any covert manner." *Richmond,* 448 U.S. at 567, 100 S.Ct. 2814 (quoting The 1677 Concessions and Agreements of West New Jersey).

The Press's access to the transcript of the hearings would "enhance[ ] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press–Enterprise I,* 464 U.S. at 508, 104 S.Ct. 819. Without this transcript, the public had no way of knowing that two of the jurors had received telephone threats that might have affected—however negligibly—their assessment of the evidence against Symington. In fact, the public could well have affirmatively inferred that such threats had *not* occurred, because the court had asked both jurors to refrain from responding during the open-court inquiry into outside communications with the jury. This outright conflict between the record of the open hearing and the sealed transcript of the closed hearing risked creating the "two-tier system" of "open and closed" records that we have previously deplored. *CBS, Inc. v. United States Dist. Court,* 765 F.2d 823, 826 (9th Cir.1985) ("If the right of access is to be meaningful, a court has the duty to ensure that its records are accurate.... If public records cannot be compared with the sealed ones, all of the former are put in doubt.").

Furthermore, in the absence of any suggestion of misconduct on the part of the two jurors themselves, their privacy interests do not militate against recognizing a right of access to the transcript, in which they were named by their juror numbers only. *See United States v. Kaczynski,* 154 F.3d 930, 931–32, 1998 WL 510393 *2 (9th Cir. August 20, 1998) (holding that defendant's privacy concerns did not outweigh legitimate public interest in the court's competency determination and defendant's motivation for committing crimes).

The timing of the request is also critical. In *United States v. Simone,* 14 F.3d 833 (3d Cir.1994), the Third Circuit drew a sharp contrast between mid-trial and post-trial closure of hearings concerning juror misconduct, noting:

> Whether or not one accepts the reasoning of the Edwards court, it is apparent that a mid-trial voir dire presents a distinct set of concerns. The court was persuaded by the fact that the jury would have to continue to function as a body after the investigation into misconduct was completed. It felt that publicity would jeopardize the jury's ability to do so. In this case, however, the jury had reached a verdict and no longer needed to function as a body. As a result, the factors that tipped the balance in Edwards are not present. What remains is the Fifth Circuit's observation that "[t]he issue of potential juror misconduct goes to the very heart of public confidence in the fairness or appearance of fairness in judicial proceedings. Once the spectre of a tainted jury is raised, public scrutiny of the

---

2. There are occasions when permanent sealing is justified, such as the sealing of portions of hearing related to grand jury proceedings where those proceedings are sealed by law. *See, e.g.,*

*United States v. Sierra,* 784 F.2d 1518, 1522 (11th Cir.1986). However, those are not at issue in this case.

resolution of the issue is essential." *Id.* at 116.

14 F.3d at 840.

Thus, either under an historic analysis or by considering whether access "would serve as a curb on prosecutorial or judicial misconduct or would further the public's interest in understanding the criminal justice system" *Oregonian,* 920 F.2d at 1465, the Press had a qualified right of access to the transcript of the August 22, 1997 closed hearings.

## IV

■ When a qualified right of access exists and the trial court is confronted with legitimate competing interests, the trial court must carefully balance those interests. In those circumstances, as the Supreme Court concluded in *Press–Enterprise II,* the presumption of access is overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735. The trial court must articulate this interest "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at 9–10, 106 S.Ct. 2735. Under *Press–Enterprise II,* closure may be ordered only if specific findings are made demonstrating that "first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Id.* at 14, 106 S.Ct. 2735.

■ We amplified this analysis in *Oregonian Publishing Co. v. United States Dist. Court,* 920 F.2d 1462, 1464 (9th Cir. 1990). Beginning with the assumption that "the press and public have a presumed right of access to court proceedings and documents," *see Oregonian,* 920 F.2d at 1465, closure may be predicated only upon the following requirements: "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure

that would adequately protect the compelling interest." *Id.* at 1466. Furthermore, the court ordering closure must "make specific factual findings," rather than "bas[ing] its decision on conclusory assertions alone." *Id.*

To be sure, a court has the right to temporarily seal access to court records pending a hearing. Indeed, if a document becomes part of the public record, the public has access to it, and the press may report its contents. *See, e.g., The Florida Star v. B.J.F.,* 491 U.S. 524, 538, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) ("Once government has placed such information in the public domain, 'reliance must rest upon the judgment of those who decide what to publish or broadcast.' " [quoting *Cox Broadcasting v. Cohn,* 420 U.S. 469, 496, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) ] ).

■ However, if a court contemplates sealing a document or transcript, it must provide sufficient notice to the public and press to afford them the opportunity to object or offer alternatives. If objections are made, a hearing on the objections must be held as soon as possible.

Those procedural requirements were not followed in this case. The trial ended on September 3, 1997, but the transcript was not released until October 15, 1997. The court did not hold a hearing on the Press's post-trial motion for release of the transcript. Rather, it issued a conclusory order, summarily denying the motion and rejecting the possibility of alternatives. The court reiterated its position shortly thereafter in a second summary order. It was only at the behest of defense counsel, who had become the subject of unwarranted speculation, that the court finally released a redacted transcript. In short, at no time was the Press afforded a meaningful opportunity to address sealing the transcripts on the merits, or to discuss with the court viable alternatives.

■ Further, even if these procedural safeguards had been sufficient to meet the requirements of the First Amendment, the district court's closure orders fell short of

satisfying the First Amendment's substantive requirements.[3]

The record reveals that the sealing of the transcript transgressed the substantive dictates of the First Amendment. Not only did the district court neglect to make specific factual findings supporting its closure decision, *see CBS, Inc. v. United States Dist. Court,* 765 F.2d 823, 825 (9th Cir.1985), but the decision itself failed to satisfy all three substantive requirements for closure.

At no time did the court specifically explain the necessary connection between unsealing the transcript and inflicting irreparable damage upon the security concerns it invoked as a compelling interest. Relying only upon these generalized concerns in the sealed October 2, 1997 order it issued nearly a month after the jury had delivered its guilty verdict, the court stated: "The Court has been advised that the investigation is ongoing and that it is in a posture that the disclosure of the transcript would constitute a serious risk of compromising the investigation. As a result of the status of the investigation, the transcript remains sealed."

Hence, neither in the written closure orders nor in the hearings themselves did the court specify just how security would be "thwarted," and how, in turn, this "thwarting" would threaten Symington's fair trial rights. Far from allowing "meaningful appellate review" of the closure order, *see Brooklier,* 685 F.2d at 1168, these "general statements," which simply stated that security interests compelled closure, closely resembled those we deemed inadequate in *Brooklier. Id.* at 1169 ("General statements that the court concludes closure is necessary from a balancing of first and sixth amendment [sic] interests in the light of the presence of 'problems of publicity' does [sic] not afford a basis for determining whether the court applied the correct standard in weighing possible prejudice from open proceedings or whether the court's conclusion was supported by the record.").

Nor was there any indication that the jurors' security, under the circumstances, was in fact a compelling interest justifying the continued sealing of the hearing transcript. Indeed, every fact present in the record provided a contrary indication. There is no evidence that any juror security problems followed the threats. The relatively limited "security measures" the court implemented suggest that jurors' security was not in actuality an urgent problem. The character of these measures shows they were aimed at shielding the jurors' identities from the media, rather than protecting them from danger: the jurors were allowed to park in the rear of the courthouse and were given special key cards so that they could enter the courthouse unobserved, but the court considered no phone tap, police escort, or sequestration alternatives to diminish the possibility that the telephone threats would recur.

Although the court apparently reevaluated its decision not to release the transcript on October 2, the orders it issued on that date reveal nothing about the specific character of the risk to the jury tampering investigation that would result from unsealing the transcript. Nor, during the closed October 15 hearing, did the FBI present any evidence to show that earlier disclosure would have been prejudicial or unreasonable. Indeed, a compelling argument can be made that post-trial disclosure of potential threats might well have enhanced juror safety through deterrence. Simply put, there was no evidence in the record, nor were any satisfactory findings entered, establishing why release of the transcripts would endanger juror safety. Absent that evidence, there was no reason to delay the release of the transcript. *See Brooklier,* 685 F.2d at 1172 ("[T]ranscripts of properly closed proceedings must be released when the danger of prejudice has passed.").

Finally, the court failed to establish the absence of alternatives to closure that would adequately protect the jurors' security interests. In its September 5 order, the court observed: "Although the media suggests that certain portions of the transcript could be redacted, the Court finds that so much of the transcript would have to be redacted that the

---

**3.** We emphasize that when we use the word "closure" in this opinion, we are focusing upon the decision to preclude access to the transcripts after the trial was over, rather than upon the original decision to close the hearings themselves.

remaining portion would be unintelligible and/or would shed little, if any, light on the proceeding." Likewise, in its sealed October 2 order, the court did not even assert that there was a substantial probability that alternatives to denying access to the transcript would not adequately protect the investigation, let alone consider the "obvious candidate" of voluntary agreement by the Press regarding the scope and timing of coverage, *see Brooklier*, 685 F.2d at 1173. The court never elaborated any further upon the chain of reasoning that had led it to reject certain alternatives in favor of preserving the seal on the transcript.

Indeed, redaction of the juror's names and addresses from the transcript—as was ultimately accomplished—would have sustained the protection of the jurors' security interests that the parking and key card measures had conferred. Like these other measures, redaction would have safeguarded the jurors' anonymity. To the degree that Juror No. 114's account of the telephone threat involved Dowd, Symington's counsel, the court could have also redacted those portions of her testimony that alluded to Dowd.

For these reasons, the district court met neither the procedural nor the substantive prerequisites for sealing the transcript of the August 22 hearings. In denying access to the transcript, public confidence was unnecessarily eroded.

The procedural and substantive safeguards described in *Oregonian* and *Brooklier* are not mere punctilios, to be observed when convenient. They provide the essential, indeed only, means by which the public's voice can be heard. All too often, parties to the litigation are either indifferent or antipathetic to disclosure requests. This is to be expected: it is not their charge to represent the rights of others. However, balancing interests cannot be performed in a vacuum. Thus, providing the public notice and an opportunity to be heard ensures that the trial court will have a true opportunity to weigh the legitimate concerns of all those affected by a closure decision. Similarly, entry of specific findings allows fair assessment of the trial judge's reasoning by the public and the appellate courts, enhancing trust in the judi-

cial process and minimizing fear that justice is being administered clandestinely.

The circumstances of this case underscore those concerns. Although undoubtedly acting with the best intent under challenging conditions, the trial judge not only failed to disclose trial proceedings, but requested the two jurors not to respond to the open court inquiry to all jurors about contact by anyone outside the jury. This resulted in the creation of a trial record at variance with the true facts. That consequence would be a matter of grave import by any measure; it is particularly unfortunate when the salient issue is jury tampering in the criminal trial of a public official. Although that action cannot be condoned, an immediate post-trial hearing and transcript release would have ameliorated the potential for public misunderstanding and alarm.

Under the demands of high profile trials with large media exposure, we cannot expect trial judges to make perfect decisions. However, following the procedural and substantive guidelines of *Oregonian* and *Brooklier* allows courts to make more informed judgments, and lessen the possibility of error.

As the Supreme Court has observed, "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and society as a whole." *Globe Newspaper*, 457 U.S. at 606, 102 S.Ct. 2613. Here, the failure to disclose the truth of trial proceedings unfortunately created the potential for suspicion and mistrust, precisely the consequences a public trial is designed to forfend.

## V

■■■■ We are empowered to grant mandamus relief if the Press can establish the presence of several of the following factors:

1) the [Press] has no other means, such as a direct appeal, of attaining the desired relief,

2) the [Press] will be damaged in a way not correctable on appeal,

3) the district court's order is clearly erroneous as a matter of law,

**952**

4) the order is an oft-repeated error, or manifests a persistent disregard of the federal rules, and

5) the order raises new and important problems, or issues of law of first impression.

*Seattle Times Co.*, 845 F.2d at 1515. All of the factors need not be present for a writ of mandamus to issue. *Sacramento Bee*, 656 F.2d at 481. Rather, "[t]he guidelines are cumulative and a proper disposition requires a balancing of competing factors." *Oregonian*, 920 F.2d at 1464.

That the first, second, and fifth factors are present in the instant case is readily apparent. First, like the petitioner in *Oregonian*, the Press lacks standing to bring a direct appeal and must therefore rely exclusively upon a petition for writ of mandamus to seek review of orders denying it access to judicial documents or proceedings. *Oregonian*, 920 F.2d at 1465. Second, the Press cannot win redress on appeal for its injury from the delay in the release of the hearing transcript. *See Sacramento Bee*, 656 F.2d at 481 (finding that closure of hearing and denial of access to hearing transcripts until immediately after trial fulfilled second factor for mandamus). Third, the district court's sealing of the hearing transcript presents an issue of first impression in this Circuit. As the district court has neither committed an "oft-repeated error" nor evinced "a persistent disregard of the federal rules," *see id.* ("The fourth factor does not support issuance because two closure orders in an unusually well publicized criminal trial do not qualify as oft-repeated error."), the key remaining factor is whether we can be "firmly convinced that [the] district court ... erred in deciding" to seal the transcript and delay its release, *see Seattle Times*, 845 F.2d at 1515.

Although we find error, we are not persuaded that mandamus is the appropriate remedy. *See Brooklier*, 685 F.2d at 1173. We are not unmindful of the pressures of a high profile trial, and the delicate situation with which this extremely able trial judge was confronted. Thus, although the district court erred in both the procedures surrounding its post-trial decision to seal the transcript and the substance of that decision, we decline to issue a writ of mandamus. Rather than perpetuating the "empty gesture" we eschewed in *Brooklier*, given that the transcripts have long since been released, *see Brooklier*, 685 F.2d at 1173, we express our confidence that the district court will heed the guidelines we have enunciated. Indeed, it has already made that pledge on the record of this case.

Accordingly, we deny the petition for writ of mandamus. Each party shall bear its own costs.

DENIED.