**UNITED STATES of America,**
**Plaintiff,**

v.

**John Travis KETNER,**
**et al., Defendants.**

**No. EP–06–CR–1369–FM.**

United States District Court,
W.D. Texas,
El Paso Division.

May 28, 2008.

Debra P. Kanof, William Franklin Lewis, Jr., United States Attorney's Office, El Paso, TX, for Plaintiff.

## MEMORANDUM OPINION AND ORDER REGARDING MOTION FOR LEAVE TO INTERVENE

FRANK MONTALVO, District Judge.

Before the Court is Carl Starr's ("Starr") *pro se* "Motion for Leave to File Motion to Intervene for the Limited Purpose of Being Heard in Connection with Access to Certain Portions of the Record and Hearings and Memorandum in Support" ("Motion for Leave to Intervene") [Rec. No. 57], filed in the above-captioned cause on March 26, 2008. Attached to his Motion for Leave to Intervene is Starr's proposed "Motion to Intervene for the Limited Purpose of Being Heard in Connection with Access to Certain Portions of the Record and Hearings and Memorandum in Support" ("Proposed Motion to Intervene"). Therein, Starr asks the Court to: (1) unseal all presently-sealed plea agreements filed in this cause; (2) unseal any other sealed papers filed in this cause; and (3) open all hearings convened in this cause to the public. Implicitly, Starr also asks the Court to unseal the transcripts for any closed hearings which occurred before he filed his Motion for Leave to Intervene, as well as to make any future hearings open to the public. Starr additionally seeks access to affidavits underlying search warrants associated with the Government's ongoing public corruption investigation. If the Court determines compelling interests require the sealing of all or a portion of the previously listed documents or the closing of hearings to the public, Starr asks the Court to issue a written order stating its findings of fact and conclusions of law which support its decision.

In a motion [Rec. No. 58] filed on April 7, 2008, Starr also asks the Court to set an oral hearing on his Motion for Leave to Intervene. On April 29, 2008, Starr filed another motion [Rec. No. 59] seeking leave to supplement his original Motion for Leave to Intervene with summaries of two additional cases which he believes support his request for access.

For the reasons discussed below, the Court finds it should deny Starr's motion for an oral hearing; grant his motion to supplement his original Motion for Leave to Intervene; and deny Starr's Motion for Leave to Intervene with the exceptions set forth in Part VI of the Memorandum Opinion.

## I. *PRELIMINARY PROCEDURAL CONSIDERATIONS*

### A. *The Procedural Propriety of a Motion to "Intervene"*

Before it may consider the merits of Starr's filing, the Court must determine the legal basis for it. Starr has invoked the First Amendment and titled the motion he wishes to file as a motion to "intervene." No such procedural vehicle exists in criminal cases. Rather, a motion to intervene is a procedural vehicle used in civil actions.[1] Further, in the context of determining whether an appeal is properly before it, the Fifth Circuit has indicated certain misgivings regarding the procedural propriety of such self-described "motions to intervene" filed in cases challenging lack of media access to trial proceedings.[2]

> The courts differ on whether the media, though not parties to a case, may [directly] appeal closure orders or must seek other avenues of review. Some, including ours, have allowed such [direct] appeals. Others allow an appeal after one of the media has "intervened" in the underlying action for the purpose of challenging the closure order.[3]

In addition, the Fifth Circuit has stated that "third parties lack standing in criminal proceedings." [4]

> The direct, distinct and palpable injury in a criminal sentencing proceeding plainly falls only on the defendant who is being sentenced. It is the defendant and he alone that suffers the direct consequences of a criminal conviction and sentence. Collateral individuals to the proceeding ... have not suffered an Article III direct injury sufficient to invoke a federal court's jurisdiction to rule on their claim. For this reason, a private citizen generally lacks standing "to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." [5]

Be that as it may, courts, including courts of this Circuit, have implicitly recognized the ability of the press or public to object, on First Amendment or common law grounds, to a judicial decision closing hearings and sealing documents in criminal cases by way of a motion or petition filed in the appropriate district court.[6] Thus,

---

1. *See* FED.R.CIV.P. 24 (describing intervention of right and permissive intervention in a civil proceeding).

2. *See United States v. Chagra,* 701 F.2d 354, 359 (5th Cir.1983).

3. *Id.* (internal citations omitted).

4. *McClure v. Ashcroft,* 335 F.3d 404, 411 (5th Cir.2003); *see United States v. Grundhoefer,* 916 F.2d 788, 792 (2d Cir.1990).

5. *Grundhoefer,* 916 F.2d at 792; *see McClure,* 335 F.3d at 411 (citing *Grundhoefer* with approval).

6. *See, e.g., In re Providence Journal Co.,* 293 F.3d 1, 6–7 (1st Cir.2002) (relating the proce-

mindful of Starr's *pro se* status, the Court will interpret his Motion for Leave to Intervene as an objection to the undersigned's decisions to close certain hearings and seal various documents filed in this cause. The Court will also interpret his Motion for Leave to Intervene as a request for it to: (1) inform the public and press of upcoming hearings in this cause, if any, by posting notice of such hearings on the Court's public calendar and the electronic case docket for this cause; and (2) keep any such proceedings open to the press and general public.

### B. Starr's Request for an Oral Hearing

Starr's Motion for Leave to Intervene concerns issues of law which are adequately briefed in his written pleadings. It does not involve any disputed issues of fact which would require determination by the undersigned. When a motion raises only issues of law instead of law and disputed facts, it is standard procedure for federal district courts to decide the motion based on the parties' written submissions. The Local Court Rules for the Western District of Texas reflect this procedure: "A movant or respondent may specifically request an oral hearing, but the allowance of an oral hearing shall be within the sole discretion

of the judge to whom the motion is assigned." [7]

The Court finds it has sufficient facts and legal authority before it to make an informed decision on the merits of Starr's Motion for Leave to Intervene, rendering it unnecessary to hear live argument. The Court will accordingly rule on Starr's Motion for Leave to Intervene based on the pleadings on file.

Having disposed of these preliminary procedural issues, the Court now sets forth the relevant factual and procedural history of this case.

## II. BACKGROUND

The above-captioned cause arises from a lengthy and still ongoing criminal investigation conducted by the Federal Bureau of Investigation, El Paso Division, into allegations of public corruption by El Paso County officials and their associates. The investigation began in the summer of 2004 and has allegedly uncovered systemic and wide-spread public corruption and other fraudulent activities directed by individuals within the greater El Paso community.

The initial Cooperating Witness engaged in over 350 consensually monitored conversations. The United States Attorney applied for an electronic surveillance warrant

---

dural process through which a newspaper sought access to certain documents filed in a widely publicized public corruption case); *United States v. Edwards*, 823 F.2d 111, 113–14 (5th Cir.1987) (describing the process by which the press objected to the *in camera* questioning of jurors when a question of outside influence arose during trial and the sealing of the associated transcript); *In re Washington Post Co.*, 807 F.2d 383, 387 (4th Cir. 1986) (recounting that the newspaper filed a motion in district court seeking the release of a plea hearing transcript and a right to attend future hearings in the case); *Chagra*, 701 F.2d at 356–57 (describing the process by which news reporters objected to a magistrate judge's decision, upon the defendant's re-

quest, to close portions of the defendant's bond reduction hearing to the public); *United States v. Gurney*, 558 F.2d 1202, 1205 (5th Cir.1977) (during a high profile trial, news reporters filed a "Petition for Hearing and for Vacation of Restrictions on Press and Other News Media," challenging the trial court's refusal to give the reporters access to certain documents and exhibits).

**7.** LCVR–7(g); *see also Crestview Parke Care Ctr. v. Thompson*, 373 F.3d 743, 750 (6th Cir.2004) ("[F]ederal district courts can decide cases as a matter of law without an oral hearing when it is clear there are no genuine material [factual] disputes to be resolved").

(i.e., a wiretap) pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1996, codified at 18 U.S.C. §§ 2510–2520 ("Title III"). The wiretap began on July 13, 2005, on three separate telephone lines. The wiretap on Line 2 concluded during December 2005. The wiretap on Line 1 concluded in May 2006. The wiretap on Line 3 concluded in June 2006. All told, the Government conducted twenty-five months' worth of surveillance on the three lines, during which the Government intercepted thousands of conversations and text messages. On May 15, 2007, pursuant to this Court's Order, the United States Attorney mailed or hand delivered notifications to 154 persons whose conversations were intercepted.

Over eighty "persons of interest" have been linked to the investigation. A "person of interest" is someone with personal knowledge of the conduct under investigation, but who is not necessarily suspected of criminal conduct. Of these individuals, thirty-five are past or current public officials, either elected or appointed, thirteen are attorneys and three are or were judges. These individuals represent a wide cross-section of the greater El Paso area, and in many cases, are prominent community figures.

To date, the FBI has executed twenty-one searches, including two consent searches, and eight civil seizure warrants. The FBI executed the first search warrant at Hospice El Paso ("HEP") on April 21, 2006. At HEP, the authorities seized 554 boxes of evidence.

The FBI executed a second series of search warrants on three sites located at the National Center for the Employment of the Disabled's ("NCED") premises on May 9, 2006. The FBI conducted a consent search at the offices of NCED's contracted accounting firm on the same date.

Agents seized 1,332 boxes of evidence from NCED and NCED's accounting firm.

The FBI executed the third search warrant on the residence of Marc Schwartz ("Schwartz") on June 15, 2006. Agents seized nineteen boxes of evidence at Schwartz's residence.

The fourth series of search warrants were executed on Access Administrators (a third party administrator for self-insured employee healthcare benefit plans) ("Access"); Access subsidiaries Advantage Care Network and Physicians Healthcare Management; the residence of Access President Frank Apodaca ("Apodaca"); and the office/residence of local attorney Luther Jones ("Jones") on September 7, 2006. At Access and its two subsidiaries, 251 boxes of evidence were seized. At Apodaca's residence and from one vehicle and another consensually searched vehicle, thirty boxes of evidence were seized. At Jones's office/residence, eight boxes of evidence were seized.

On December 15, 2006, the FBI executed a fifth series of search warrants on Salvador Marcos ("Sal") Mena, Jr.'s ("Mena") residence and business, the Sal Mena, Jr. Insurance Agency. Mena was then an El Paso Independent School District ("EPISD") Trustee. The FBI seized forty-seven boxes of evidence from Mena's residence and business. Agents also seized $28,250 in cash from a third search location: Mena's bank safe deposit box.

A sixth series of search warrants were executed on the offices of El Paso County Judge Anthony Cobos ("Cobos"), Commissioner Luis Sarinana ("Sarinana"), and Commissioner Miguel A. Teran ("Teran") at the El Paso County Courthouse on May 15, 2007. Search warrants were also executed on the residence of Commissioner Teran and the residence of El Paso County ("Thomason") Hospital District Board Member Arturo Duran ("Duran"). Agents

seized sixteen boxes of evidence from Cobos's office, twelve boxes of evidence from Sarinana's office, twenty-one boxes of evidence and nineteen boxes of evidence from Teran's office and residence, respectively, and sixteen boxes of evidence from Duran's residence.

On May 18, 2007, agents executed civil seizure warrants on Roberto Gerardo "Bobby" Ruiz ("Ruiz"), who was then an investment banker for Bear Stearns. Agents also seized over 800,000 stock shares, $25,000 in a profit-sharing account, $20,000 in a 401K account, and $41,000 from Ruiz's Bank of America account.

Agents executed civil seizure warrants on Apodaca on May 21, 2007. The FBI seized approximately $240,000 from Apodaca's Chase Bank accounts, $89,000 from Government Employees Credit Union ("GECU") accounts, a Mercedes valued at $32,000, a Cadillac Escalade valued at $29,000, and a Harley Davidson motorcycle valued at $11,000. Agents additionally served a civil seizure warrant on the trust account of Apodaca's criminal defense attorney, Ray Velarde ("Velarde"), on September 21, 2007. Pursuant to that warrant, they seized approximately $75,000 of Apodaca's funds held in trust by Velarde.

As of this writing, approximately twelve separate investigations are in progress as a result of the investigatory work initiated in the summer of 2004. To date, the FBI has seized over 2,300 boxes of evidence from the execution of various search warrants and consensual searches. FBI personnel have conducted interviews with numerous individuals. FBI personnel have interviewed some of these same people on multiple occasions. This is especially true of the defendants who have pleaded guilty and continue to debrief, and also of the confidential sources who continue to provide new information. It is estimated the FBI Computer Analysis Response Team ("CART") examiners have retrieved over sixteen terabytes (1 terabyte = 1000 gigabytes) of computer data evidence contained within over 180 various forms of computer hardware (e.g., mainframe servers, desktop computers, laptops, thumb drives, etc.) seized from all the various search sites, in addition to the sizeable amount of computer data seized from the El Paso County Courthouse's mainframe servers.

In order to allow the subject searches and seizures, the Court has, as it is constitutionally mandated to do, reviewed lengthy affidavits. These affidavits describe in exacting detail the probable cause for each and every one of these searches and seizures. These affidavits reflect the substance of a carefully conducted investigation into various and diverse courses of conduct. This Court in each instance was convinced that publicizing the content of these affidavits would jeopardize the investigation and risk the livelihood and welfare of the persons who have cooperated in this investigation.

Rather than waiting for the Government to seek indictments against them from a grand jury, the following individuals have voluntarily chosen to cooperate with the active investigation, as set forth below.

### A. Defendant John Travis Ketner

The prosecutorial stage of the case formally began on June 8, 2007. On that date, the Government filed an unsealed, four-count, eighteen-page Information [Rec. No. 1] against Defendant John Travis Ketner ("Ketner"), charging him with conspiracy to commit mail, wire, and deprivation-of-honest-services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349 (Counts One, Three, and Four); and conspiracy to commit bribery concerning programs receiving federal funds, in violation

of 18 U.S.C. §§ 371 and 666 (Count Two).[8] The Information gave a general introduction identifying unindicted co-conspirators and business entities mentioned in the Information. For each count, and in substantial detail, the Information also described the alleged conspiracy, scheme and artifice to defraud, manner and means of the conspiracy, and the overt acts taken in furtherance of it.

As with all the Informations filed in this case thus far, and as it is required to do, the Government properly referred to the unindicted co-conspirators only by pseudonyms such as "JohnCC–1" and "JaneCC–1" and the businesses by their acronyms.[9] With the Information, the Government filed a sealed Bill of Particulars in which it specifically identified the unindicted co-conspirators and entities.[10] In addition, the Bill of Particulars, as used by the Government herein, provided Ketner with further details of the allegations contained in the Information, The Information, though correct in form and sufficient to apprise Ketner of the alleged violations of the law, is indefinite in some of its statements. The Bill of Particulars provides a level of detail, which if made public by

inclusion in the Information, would seriously impair the ongoing investigation.

Accompanied by his counsel, Ketner appeared before the Court on June 8, 2007, and entered a guilty plea to the Information, pursuant to a plea agreement and attached factual basis filed under seal. The proceeding occurred at the United States Courthouse in San Antonio, Texas, the administrative seat of the Western District of Texas. The El Paso Division is part of the Western District of Texas.[11] The undersigned conducted the hearing in San Antonio in response to security concerns.

Notice of Ketner's plea hearing did not appear on the Court's public calendar or the electronic case management system. The Court closed the plea proceeding to the public. It additionally sealed the minutes and transcript of the plea proceeding. On June 18, 2007, the Court entered the following documents under seal as to Ketner: (1) an "Order Setting Bond," (2) a "Release Order," and (3) an executed "Appearance and Compliance Bond."

### B. Defendant Elizabeth "Betti" Flores

On July 6, 2007, the Government filed a six-count Information [Rec. No. 11] against

---

**8.** On the same day, Ketner signed a written waiver relinquishing his right to be indicted by a grand jury.

**9.** *See In re Smith,* 656 F.2d 1101, 1106 (5th Cir.1981) ("The government in this case urges us to accept the procedures followed regarding the [publicly available] factual resumes [filed in the case, specifically naming an unindicted third party as the recipient of illicit payments,] to be consistent with [*United States v.] Briggs* [, 514 F.2d 794 (5th Cir. 1975)]. The government argues that *Briggs* only forbids the naming of unindicted co-conspirators by a federal grand jury. We cannot agree. The point made in the *Briggs* decision is that no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate

his rights. We can think of no reason to distinguish between an official defamation originating from a federal grand jury or an Assistant United States Attorney. The *Briggs* decision would be rendered meaningless if it could be so easily circumvented by the actions of an Assistant United States Attorney."); *Briggs,* 514 F.2d at 805 (heavily criticizing the practice of actually naming individuals as unindicted co-conspirators in an indictment charging a criminal conspiracy, when the identities may be supplied, upon request, through a bill of particulars).

**10.** *See Briggs,* 514 F.2d at 805.

**11.** *See* 28 U.S.C. § 124(d) (setting forth the seven judicial divisions which comprise the Western District of Texas).

Defendant Elizabeth "Betti" Flores ("Flores").[12] Therein, the Government charged Flores with conspiracy to commit mail, wire, and deprivation-of-honest-services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349. Accompanied by her counsel, Flores appeared before the Court on the same day and entered a plea of guilty pursuant to a plea agreement and attached factual basis filed under seal. Notice of Flores's plea hearing did not appear on the Court's public calendar or the electronic docket for the case. The Court closed the plea proceeding to the public. It additionally sealed the minutes and transcript of the plea proceeding. The Court further entered the following documents under seal as to Flores: (1) an "Order Setting Bond," (2) a "Release Order," and (3) an executed "Appearance and Compliance Bond."

## C. Defendant Bernardo Lucero, Jr.

On August 17, 2007, the Government filed a two-count Information [Rec. No. 30] against Defendant Bernardo Lucero, Jr. ("Lucero"), charging him with conspiracy to commit mail and deprivation-of-honest-services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349 (Count One); and conspiracy to make false statements to obtain credit, in violation of 18 U.S.C. §§ 371 and 1014 (Count Two).[13] Accompanied by his counsel, Lucero appeared before the Court the same day and entered a plea of guilty pursuant to a plea agreement and attached factual basis filed under seal. Notice of the hearing did not appear on the Court's public calendar or on its electronic docket for the case. The Court

closed the plea proceeding to the public. It additionally sealed the minutes and transcript of the plea proceeding. The Court further entered the following documents under seal as to Lucero: (1) an "Order Setting Bond," (2) a "Release Order," and (3) an executed "Appearance and Compliance Bond."

## D. Defendant Carlos Villa "Coach" Cordova

On November 28, 2007, the Government filed a one-count Information [Rec. No. 33] against Carlos Villa "Coach" Cordova ("Cordova"), charging him with conspiracy to commit mail and deprivation-of-honest-services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349. Accompanied by his attorney, Cordova appeared before the Court the same day and entered a guilty plea pursuant to a plea agreement and attached factual basis filed under seal.[14] Notice of the hearing did not appear on the Court's public calendar or the electronic docket for the case. The Court sealed the minutes and transcript of the plea hearing. The Court additionally entered the following documents under seal as to Cordova: (1) an "Order Setting Bond," (2) a "Release Order," and (3) an executed "Appearance and Compliance Bond."

## E. Defendants Roberto Gerardo "Bobby" Ruiz and Christopher "Chris" Chol–Su Pak

On December 21, 2007, the Government filed a four-count Information [Rec. No. 41] against Roberto Gerardo "Bobby" Ruiz ("Ruiz"), charging him with conspiracy to commit mail, wire, and deprivation-of-hon-

---

12. On the same day, Flores signed a written waiver relinquishing her right to be indicted by a grand jury.

13. On the same day, Lucero signed a written waiver relinquishing his right to be indicted by a grand jury.

14. The same day, Cordova signed a written waiver relinquishing his right to be indicted by a grand jury.

est-services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349. The Government additionally filed an Information [Rec. No. 42] against Christopher "Chris" Chol–Su Pak ("Pak"), charging him with one count of conspiracy to commit mail and deprivation-of-honest-services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349. Accompanied by their respective attorneys, Ruiz and Pak appeared before the Court the same day at a closed hearing and entered guilty pleas pursuant to separate plea agreements and factual bases which were filed under seal.[15] Notice of the hearing did not appear on the Court's public calendar or the electronic docket for the case. The Court sealed the minutes and transcript of the plea hearing. The Court additionally entered the following documents under seal as to Ruiz and Pak: (1) an "Order Setting Bond," (2) a "Release Order," and (3) an executed "Appearance and Compliance Bond."

### F. Defendant Raymond R. Telles

On February 15, 2008, the Government filed a two-count Information [Rec. No. 51] against Raymond R. Telles ("Telles"), charging him with conspiracy to commit mail, wire, and deprivation-of-honest-services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349. Accompanied by counsel, Telles appeared before the Court the same day to enter a guilty plea, pursuant to a plea agreement. The Court continued the hearing until March 14, 2008, on which date Telles actually entered his guilty plea. Neither hearing appeared on the Court's public calendar or its electronic docket for the case. The Court sealed the hearing minutes and transcript of the plea hearing. On March 14, 2008, the Court additionally entered the following under

seal as to Telles: (1) an "Order Setting Bond;" (2) a "Release Order," and (3) an executed "Appearance and Compliance Bond."

Having recounted the pertinent procedural history of this cause, the Court now considers the applicable law.

### III. CONFIDENTIALITY OF JUDICIAL PROCEEDINGS

#### A. The Parties' Joint Requests for Confidentiality

Every proceeding described above was held confidentially and the filings sealed at the joint request of the Government and defense counsel. During conferences preceding each plea hearing, the parties articulated concerns regarding the potential disclosure of confidential sources, the Government's investigatory methods, and the overall scope and progress of the investigation, as well as the danger of witness intimidation and physical harm should the information to be presented in court become public knowledge.

As a follow up to these conferences, on most if not all occasions, the Government made an oral motion at each plea hearing for closure of the proceedings and sealing of records, without objection from defense counsel. To preserve the integrity of the ongoing investigation, the Court acceded to the parties' joint requests for closure.

#### B. Applicable Law

The following general principles govern the public's right of access to pre– and post-indictment judicial proceedings and investigatory materials.

---

**15.** Ruiz and Pak signed written waivers relinquishing their right to be indicted by a grand jury.

1. *The Public's Right of Access to Proceedings and Materials During the Pre–Indictment, Investigatory Stage of a Criminal Prosecution*

 United States Attorneys, as delegates of the executive branch, have broad discretion to initiate and conduct criminal prosecutions.[16] " '[So] long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " [17] The United States Attorney's discretion encompasses not only the choice of what specific charges to bring, if any, but the decision regarding when, how, and where to bring them.[18]

 This broad discretion derives from the separation of powers doctrine as well as the fact that prosecutorial decisions are especially ill-suited to judicial review.[19]

Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.[20]

 In sum, the prosecution's choices regarding enforcement of the criminal laws are generally shielded from judi-

---

**16.** *See United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (noting the broad discretion the United States Attorney General and United States Attorneys, as the President's delegates, retain to enforce the country's criminal laws and discussing the reasons for this latitude).

**17.** *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)).

**18.** *See United States v. LaBonte,* 520 U.S. 751, 762, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) ("[T]he discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect ... is an integral feature of the criminal justice system, and is appropriate, so long as it is not based on improper factors."); *United States v. Lovasco,* 431 U.S. 783, 795–96, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (holding it does not offend due process to defer prosecuting a defendant where the prosecution's timing results from a bona fide investigative delay and not from an attempt to gain a tactical advantage over the accused); *United States v. McFarland,* 264 F.3d 557, 559 (5th Cir.2001) (concluding it was not improper for a federal prosecutor to bring charges in federal court for a crime that had historically been prosecuted by the state system, in order to maximize punishment for the offense); *cf. Imbler v. Pachtman,* 424 U.S. 409, 430 n. 33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (stating, in the context of determining whether the prosecutor was entitled to immunity from the plaintiff's lawsuit, "[a] prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present."); *Marrero v. Hialeah,* 625 F.2d 499, 505 n. 7 (5th Cir.1980) (quoting *Imbler,* 424 U.S. at 430 n. 33, 96 S.Ct. 984).

**19.** *See Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480; *see also Wayte,* 470 U.S. at 607, 105 S.Ct. 1524 ("This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.").

**20.** *Wayte,* 470 U.S. at 607, 105 S.Ct. 1524.

cial scrutiny. Law enforcement enjoys a similar general privilege barring interference with enforcement proceedings while its investigations are underway.[21] "The most obvious risk of 'interference' with enforcement proceedings ... is that ... [the ultimate targets of the investigation] will coerce or intimidate [those individuals] who have given statements, in an effort to make them change their testimony or not testify at all."[22] Thus, premature disclosure of witnesses' statements and other details may give the ultimate target of an investigation earlier and greater access to the Government's case than the target would otherwise have, and allow the target to construct defenses which could allow alleged illegal conduct to go unpunished.[23] The Supreme Court has concluded that it does not defeat the goals of maintaining an informed citizenry and holding "the gover-

nors accountable to the governed" to defer disclosure of sensitive investigatory material until after the Government has presented its case in court.[24] Accordingly, the Government may withhold law enforcement records or other information relating to a pending investigation where it demonstrates the release would "reveal 'the size, scope and direction of [the] investigation' and thereby 'allow for the destruction or alteration of relevant evidence, and the fabrication of fraudulent alibis.' "[25] The Government need not show "a particularized risk of interference with a particular enforcement proceeding" but only that disclosure would interfere with enforcement proceedings in general.[26] Further, the Government need not show that the investigation in question will definitely result in prosecution; the investigation need only be active.[27] In certain circumstances, the

**21.** *Cf. NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 239–43, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (discussing the nature of and rationale for the qualified law enforcement privilege against disclosure requests made pursuant to the Freedom of Information Act ("FOIA")).

**22.** *Robbins Tire,* 437 U.S. at 239, 98 S.Ct. 2311; *Dickerson v. Dept. of Justice,* 992 F.2d 1426, 1433 (6th Cir.1993) ("[T]he most obvious risk of interference with enforcement proceedings is that witnesses will be coerced or intimidated into changing their testimony or not testifying at all."); *North v. Walsh,* 881 F.2d 1088, 1097 (D.C.Cir.1989) (collecting cases in which courts concluded the forced disclosure of Government documents would constitute impermissible investigatory interference).

**23.** *See Robbins Tire,* 437 at 241, 98 S.Ct. 2311 ("In short, prehearing disclosure of witnesses' statements would involve the kind of harm that Congress believed would constitute an 'interference' with NLRB enforcement proceedings: that of giving a party litigant earlier and greater access to the Board's case than he would otherwise have. As the lower courts have noted, even without intimidation or harassment a suspected violator with ad-

vance access to the Board's case could 'construct defenses which would permit violations to go unremedied.' ").

**24.** *Id.* at 243, 98 S.Ct. 2311.

**25.** *Boyd v. Criminal Div. of U.S. Dept. of Justice,* 475 F.3d 381, 386 (D.C.Cir.2007) (quoting *Alyeska Pipeline Serv. Co. v. U.S. Envtl. Prot. Agency,* 856 F.2d 309, 312 (D.C.Cir. 1988) (brackets in original)).

**26.** *See Dickerson,* 992 F.2d at 1431 n. 5 (stating that, in *Robbins Tire,* the "Supreme Court rejected the contention that 'no generic determinations' of likely interference could ever be made, concluding instead that 'Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally 'interfere with enforcement proceedings.' ' ").

**27.** *See id.* at 1432 (concluding that, because it had adequately shown the investigation was still active, the FBI was not required to comply with a newspaper's FOIA request for information regarding the 1975 disappearance and presumed murder of union leader Jimmy

Government may continue to withhold investigatory files even when the investigation in question has concluded:

It is clear that if investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired. Few persons would respond candidly to investigators if they feared that their remarks would become public record after the proceedings. Further, the investigative techniques of the investigating body would be disclosed to the general public.[28]

2. *The Public's Right of Access to Post–Indictment Judicial Proceedings and Documents*

a. **Rights under the First Amendment**

 The First Amendment to the United States Constitution guarantees the public and the press the right to attend criminal trials unless "it is demonstrated that some curtailment of that right" is necessary " 'to protect defendant's superior right to a fair trial or that some other overriding consideration requires closure.' "[29] When the proceeding at issue is not a criminal *trial*, but rather some other associated criminal proceeding, a court decides the question of public access accordingly, on a proceeding-by-proceeding basis.[30] First, the court must determine whether the First Amendment right of access—and the accompanying presumption that the proceeding will be open to the public—attaches to the particular proceeding at issue.[31] To do so, it considers: (1) " 'whether the place and the process has historically been open to the press and general public' "; and (2) " 'whether public access plays a significant positive role in the functioning of the particular process in question.' "[32] If the court concludes a First Amendment right of access and presumption of openness attaches to the proceeding in question, "the presumption of openness can be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."[33]

 " 'When limited closure is ordered[,] the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time.' "[34] Under certain circumstances, the First Amendment guarantees "a limited right of access to the record of closed [judicial] proceedings . . . and raises a presumption that the tran-

Hoffa, even though more than a decade had passed since Hoffa's disappearance and the Government had not filed charges against those involved).

28. *Black v. Sheraton Corp. of America,* 564 F.2d 531, 546 (D.C.Cir.1977) (quoting *Aspin v. Dept. of Defense,* 491 F.2d 24, 30 (D.C.Cir. 1973)).

29. *Chagra,* 701 F.2d at 361 (quoting *Richmond Newspapers v. Virginia,* 448 U.S. 555, 564, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (Burger, C.J., joined by White and Stevens, J.J.)).

30. *Edwards,* 823 F.2d at 115 & 119 (citing *Press–Enterprise Co. v. Superior Court of Cal.* (*"Press II "*), 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), and *Globe Newspaper Co. v. Superior Ct.,* 457 U.S. 596, 610 n. 25, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), respectively).

31. *Edwards,* 823 F.2d at 115.

32. *Id.*

33. *Id.*

34. *Id.* at 118 (quoting *Press–Enterprise Co. v. Superior Ct. of Cal. ("Press I "),* 464 U.S. 501, 512, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).

script of such proceedings will be released within a reasonable time." [35] A trial court should "avoid unnecessary delay in releasing the record of closed proceedings after trial. When a motion is made for release of transcripts, the trial court should anticipate their probable post-trial disclosure and endeavor to release them as soon after verdict as possible." [36]

In order for the required proceeding-by-proceeding resolution of issues concerning closure of presumptively open proceedings to be effective, " 'the press and general public must be given an opportunity to be heard on the question of their exclusion.' " [37] "If the closure of a presumptively open proceeding is to withstand a first amendment challenge," the trial court must "make specific, on-the-record, factfindings demonstrating that a substantial probability exists that an interest of a higher value will be prejudiced and that no reasonable alternatives to closure will adequately protect that interest." [38] "Similarly, if the presumption that transcripts will be released is to be effective, once the press files a motion for disclosure, it must be given a meaningful opportunity to be heard before any contrary decision is made." [39] Permanent redaction of tran-

scripts may in certain circumstances represent a reasonable alternative to non-release.[40]

### b. The Public's Common–Law Right of Access

American courts recognize a general right to inspect and copy public records and documents, including judicial records and documents.[41] "It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." [42]

It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.[43]

---

35. *Cf. Edwards*, 823 F.2d at 118 ("We conclude that the first amendment guarantees a limited right of access to the record of closed proceedings concerning potential jury misconduct and raises a presumption that the transcript of such proceedings will be released within a reasonable time.").

36. *Id.* at 119.

37. *Id.* (quoting *Globe*, 457 U.S. at 610 n. 25, 102 S.Ct. 2613).

38. *Id.* (relying on *Press II*, 478 U.S. at 13–14, 106 S.Ct. 2735).

39. *Id.* (citing *In re Washington Post*, 807 F.2d 383 (4th Cir.1986)).

40. *See id.* at 120 (relying on *Press I*, 464 U.S. at 512, 104 S.Ct. 819).

41. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

42. *Id.* at 598, 98 S.Ct. 1306.

43. *Id.* at 598–99, 98 S.Ct. 1306; *see also Belo Broadcasting Corp. v. Clark*, 654 F.2d 423 (5th Cir. Unit A 1981) (" 'Because no clear rules can be articulated as to when judicial records should be closed to the public, the decision to do so necessarily rests within the sound discretion of the courts, subject to appellate review for abuse.' ") (quoting *United States v. Mitchell*, 551 F.2d 1252, 1260 (D.C.Cir. 1976)).

With these general principles in mind, the Court turns to Starr's Motion for Leave to Intervene.

## IV. ANALYSIS

The Court is well aware of and understands the public's keen interest in the proceedings and documents associated with this case. On every occasion in which a hearing and documents have been held confidentially, the Court has weighed the public's right of access against the Government's need to maintain the integrity of its lengthy, complex, and ongoing investigation into public corruption, which the media itself has conceded is critically important to the community's future prospects.[44] As Texas Monthly columnist Paul Burka recently observed, "[t]he FBI's investigation of corruption in El Paso isn't just another crime story. It's the latest chapter in the frustrating saga of a city cheated of its destiny."[45] Burka continues:

> Corruption is a betrayal of civic virtue, and this scandal could not have come at a worse moment for El Paso. For the first time since the old industries began shutting down, the city's economic prospects are on the rise. Fort Bliss is booming, with billions of dollars in new construction under way and thousands of troops scheduled to relocate there, along with their dependents. The Texas Tech medical school, which was recently accredited, will begin admitting four-year students next year, and the hope is that it will become a national leader in diseases that are disproportionately suffered by Hispanics, such as diabetes. The school will attract medical professionals and raise the quality of health care; it may also attract health-related industries with jobs that pay more than the current norm. The University of Texas at El Paso is rapidly growing as well.

> Perhaps these developments will jolt El Paso's somnambulent business community, whose leaders have been generous with their philanthropy but largely indifferent to improving the lot of the minority population here . . .

> For the moment, however, El Paso's future rests with the FBI. Having started the crackdown on corruption, it must see things through to the end or there will be anarchy and the longed-for boom will not occur. No one is going to pour energy and effort and dollars into a city with a crooked government.[46]

At stake in this matter is not secrecy for its own sake. The rights of the defendants are not in peril, as they have each, through their respective counsel, asked for the plea proceedings to be held confidentially. Each of them pleaded guilty freely and voluntarily. Rather, the Court finds the need to respect prosecutorial discretion, preserve the integrity of the investigation, and protect the due process rights of unindicted co-conspirators overrides the public's right of access and the presumption of open proceedings. It has accordingly granted the Government's and defense counsels' joint requests to close certain hearings to the public and seal certain documents, until such time as they may be unsealed without jeopardizing the Government's investigation.

Against this backdrop, the Court now considers Starr's request to unseal these documents, transcripts of the closed proceedings, and investigatory documents.

---

44. *See* Paul Burka, *Fed Up*, TEXAS MONTHLY, April 2008, at 12 (discussing the significance of the FBI's investigation of corruption in El Paso to the city's future).

45. *Id.*

46. *Id.* at 16.

### A. The Affidavits Underlying Search Warrants

Starr seeks access to affidavits underlying search warrants associated with the Government's ongoing public corruption investigation. Briefly stated, the Court understands Starr to argue that the public is entitled to these documents by virtue of a First Amendment right of access to affidavits underlying search warrants while an investigation is ongoing. Alternatively, the Court understands that Starr seeks to enforce an alleged common law right of access to the affidavits because they are "judicial records" and therefore presumptively open. As discussed below, there is substantial legal authority casting doubt upon Starr's argument that the public has either a First Amendment or common law right of access to the affidavits in question. Further, assuming that the public has a right of access under either theory, the right is qualified rather than absolute. The development of this case, as previously described in this Memorandum Opinion, amply demonstrates that confidentiality is essential to preserve higher values.

The Court first examines whether the First Amendment gives the public a right of access to affidavits underlying the search warrants associated with this case. For there to be a First Amendment right of access to the proceeding in question, the place and the process must have historically been open to the press and general public, and public access must play a significant positive role in the functioning of the particular process in question.[47] If the court concludes a First Amendment right of access and presumption of openness attaches to the proceeding in question, "the presumption of openness can be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."[48]

▇▇ Two of the three circuit courts of appeal to have directly considered the issue have concluded that the First Amendment does not provide a right of access to affidavits because the proceedings surrounding the issuance of search warrants have not historically been open to public scrutiny.[49] In *Baltimore Sun Co. v. Goetz*, the Fourth Circuit Court of Appeals stated:

> The [newspaper's] claim of a first amendment right of access to the affidavit [underlying the search warrant at issue] fails because it does not satisfy the first prong of the [Supreme Court's] test [for public access to judicial records]. Twice the Supreme Court has recognized that proceedings for the issuance of search warrants are not open.[50]

In *Times Mirror Co. v. United States*, the Ninth Circuit Court of Appeals similarly found no history of openness, and consequently, no first Amendment right of access:

> In sum, we find no First Amendment right of access to search warrant proceedings and materials when an investigation is ongoing but before indictments have been returned. We find no history of openness at this stage in the warrant

---

**47.** *Edwards,* 823 F.2d at 115.

**48.** *Id.*

**49.** *See Baltimore Sun Co. v. Goetz,* 886 F.2d 60, 64 (4th Cir.1989) (*no petition for cert. filed*) (concluding that the newspaper's claim of a first amendment right of access to the affidavit underlying the search warrant at is-

sue failed because it did not satisfy the first prong of the Supreme Court's test for public access to judicial records); *Times Mirror Co. v. United States,* 873 F.2d 1210, 1218 (9th Cir.1989) (*no petition for cert. filed*) (finding no history of openness).

**50.** *Baltimore Sun,* 886 F.2d at 64.

proceedings which might argue in favor of a constitutionally protected right of access. While public access would doubtless have some positive effect by increasing the flow of information to the public about the workings of the government and by deterring judicial and law enforcement officers from abusing the warrant process, the incremental value in public access is slight compared to the government's interest in secrecy at this stage of the investigation. This is particularly true given the other mechanisms—including suppression motions and civil actions for violation of constitutional rights—that are already in place to deter governmental abuses of the warrant process. In addition, we believe that significant privacy interests would be jeopardized if the public had access to warrant materials before indictments are returned. Accordingly, we hold that members of the public have no First Amendment right to attend warrant proceedings or to obtain the documents relating to those proceedings, while the investigation is ongoing but before indictments have been returned.[51]

In contrast, *In re Search Warrant for Secretarial Area Outside Office of Gunn,* the Eighth Circuit Court of Appeals determined the First Amendment provides a *qualified* right of access to the affidavits underlying search warrants.[52] Although it conceded that the process of issuing search warrants has historically been shielded from public scrutiny, the *Gunn* Court noted that the appellants did not seek access to the process of issuing the search war-

rants in question, but the affidavits and other materials submitted in support of them.[53] In reaching its conclusion, the Court reasoned:

First, although the process of issuing search warrants has traditionally not been conducted in an open fashion, search warrant applications and receipts are routinely filed with the clerk of the court without seal. Under the common law[,] judicial records and documents have been historically considered to be open to inspection by the public. Second, public access to documents filed in support of search warrants is important to the public's understanding of the function and operation of the judicial process and the criminal justice system and may operate as a curb on prosecutorial or judicial misconduct.

Moreover, even though a search warrant is not part of the criminal trial itself, like voir dire, a search warrant is certainly an integral part of a criminal prosecution. Search warrants are at the center of pre-trial suppression hearings, and suppression issues often determine the outcome of criminal prosecutions. Pre-trial suppression hearings, and other kinds of non trial proceedings in criminal and civil cases, have been held to be subject to the [F]irst [A]mendment right of public access by other federal courts of appeals. These courts have also extended the [F]irst [A]mendment right of public access to the documents filed in connection with these protected proceed-

---

51. *Times Mirror Co.,* 873 F.2d at 1218.

52. *In re Search Warrant for Secretarial Area Outside Office of Gunn,* 855 F.2d 569, 573 (8th Cir.1988) (*cert. denied sub. nom. Pulitzer Pub. Co. v. Duggan,* 488 U.S. 1009, 109 S.Ct. 793, 102 L.Ed.2d 784 (1989)) (finding a limited First Amendment right of public access to documents filed in support of search war-

rants, which may be overcome by a showing that the government has a compelling interest in maintaining the documents under seal and no less restrictive alternative will be effective to protect that interest).

53. *Id.* at 573.

ings.[54]

It noted, however, that its "recognition of a qualified First Amendment right of access" to the affidavits did "not automatically mean that the papers must automatically be disclosed." [55] The Court emphasized that:

> [p]roceedings may be closed and, by analogy, documents may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to that interest. The party seeking closure or sealing must show that such restriction of the [F]irst [A]mendment right of public access is necessitated by a compelling government interest. If the district court decides to close a proceeding or seal certain documents, it must explain why closure or sealing was necessary and why less restrictive alternatives were not appropriate. The district court's findings must be specific enough to enable the appellate court to determine whether its decision was proper; if the district court decides that a restriction of the [F]irst [A]mendment right of public access is warranted, the district court can even file its statement of reasons and specific findings under seal.[56]

Although the Eighth Circuit's reasoning is substantially different from the Fourth and Ninth Circuit Courts of Appeals', applying either reasoning to this case yields the same result. Even if this Court were to follow the Eighth Circuit and determine there is a First Amendment right of access to the affidavits in question, it finds, with regard to every such request to seal the affidavits, the Government amply demon-strated a compelling interest in maintaining the confidentiality.

This same compelling interest leads the Court to conclude that, although there may be a qualified common law right of access to these affidavits inasmuch as they are judicial records and presumptively open, it should exercise its discretion to maintain them under seal.[57] There is no doubt that disclosure of these documents at this point would seriously interfere with an ongoing investigation. Specifically, the Court finds that disclosing these documents to public view would pose a significant risk to the life or welfare of the cooperating witnesses and defendants, and expose these same individuals to intimidation. Critical to this conclusion is that the information at issue in this investigation can be accurately described with the exact same language used by the *Gunn* court:

> These documents describe in considerable detail the nature, scope and direction of the government's investigation and the individuals and specific projects involved. Many of the specific allegations in the documents are supported by verbatim excerpts of telephone conversations obtained through court-authorized electronic surveillance or information obtained from confidential informants or both. There is a substantial probability that the government's ongoing investigation would be severely compromised if the sealed documents were released.[58]

Thus, the Court finds the public's right of access to documents filed in support of search warrants should yield to such grave concerns.

54. *Id.*

55. *Id.* at 574 (internal quotation omitted),

56. *Id.* (internal citations and quotations omitted).

57. *See Nixon,* 435 U.S. at 597–98, 98 S.Ct. 1306.

58. *Gunn,* 855 F.2d at 574.

### B. The Plea Hearings to Date and Transcripts Thereof

■ At the outset, the Court finds it important to distinguish the public's right of access to judicial proceedings occurring *after* a grand jury has returned indictments in a criminal prosecution from its right of access, if any, to the *pre-indictment* investigatory proceedings in a criminal prosecution such as the ones at issue in Starr's Motion for Leave to Intervene.

Like the Title III and search and seizure warrants, each of the seven pleas the Court has taken in this case are part and parcel of the Government's ongoing investigation. The warrants, guilty pleas, and plea agreements all require judicial approval.[59] As there is no trial in sight, all of the pleas and warrants resulted from the Government's decisions inherent to pursuing the investigation.

While it could be argued that the Government should wait until indictments are filed before beginning to accept guilty pleas, the authority to make that decision belongs exclusively to the federal prosecutors.[60] Article n, section 3, of the Constitution vests the President of the United States and his delegates, the Attorney General and United States Attorneys, with the authority to exercise judgment in the enforcement of our Nation's laws.[61] Such authority is at the heart of prosecutorial discretion.

In this complex and lengthy investigation, the Government has chosen to advance the investigation by negotiating plea agreements to Informations with seven defendants and executing numerous warrants. It is not for this Court or the public to seek to challenge this exercise of prosecutorial discretion or to force disclosure of the information and rationale prompting the United States Attorney's Office to pursue this particular course.

In simple terms, Starr's argument can best be understood as follows: Once a defendant freely negotiates a plea agreement with the Government, that decision creates a right of public access to the totality of the investigation. Not only there is no legal authority for such an argument, but accepting this proposition would destroy the constitutional concept of prosecutorial discretion. In essence, the Government would be limited to one way of prosecuting a case, that is, by indictment and trial after the complete conclusion of its investigation, rather than, as in this case, entering into plea agreements with cooperating defendants and continuing to pursue the investigation.

For these reasons, the Court concludes it was proper to close the plea hearings which have occurred to date in this case. It further concludes it should maintain the plea hearing transcripts under seal at this time.

### C. Other Documents Associated with the Plea Hearings

At this juncture, however, the Court finds it will not jeopardize the Govern-

---

**59.** *See* 18 U.S.C. § 2518 (describing the procedure for obtaining a warrant to intercept wire, oral, or electronic communications); FED.R.CRIM.P. 11(b) (requiring judicial acceptance of a guilty plea); FED.R.CRIM.P. 11(c) (requiring judicial approval of a plea agreement); FED.R.CRIM.P. 41 (setting forth the procedure for obtaining a search and seizure warrant).

**60.** *See Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480 (discussing the United States Attorney General and United States Attorneys' roles as the President's delegates in enforcing the country's criminal laws).

**61.** *See* U.S. CONST., art. II, § 3 (stating that the executive "shall take Care that the Laws be faithfully executed.").

ment's investigation to unseal redacted versions of the plea hearing minutes, "Order Setting Bond," "Release Order," and "Appearance and Compliance Bond" for each defendant. In contrast, the Court finds the plea agreements and associated factual bases filed in this cause contain extremely detailed and sensitive information, such that opening these documents to public scrutiny at this time would seriously undermine the viability of the Government's investigation for the same reasons discussed in relation to the affidavits underlying the search warrants issued in this cause and the plea hearing transcripts. Further, as the factual bases identify alleged unindicted co-conspirators by name, the Court finds it would implicate their due process rights if it were to unseal the plea agreements and accompanying factual narratives.

### D. Future Proceedings

As with every single previous instance, the Court will continue to evaluate the need for closure of any future hearings based on the information provided by the Government and defense counsel. The Court will determine the need for closure only on an as-needed basis.

## V. FACTUAL FINDINGS

In sum, the Court makes the following factual findings applying a clear and convincing burden of proof.[62] It bases each of its factual findings on the documents filed in the case, the parties' respective representations to the Court, reasonable inferences and deductions drawn therefrom, and the undersigned's judicial experience. In the case of the probable cause affidavits underlying the search warrants issued in this cause, the Court has also relied on the

Government's verbal responses to its inquiries.

A. There is an ongoing investigation into numerous and complex allegations of public corruption, which the Government has investigated through the use of multiple search and seizure warrants.

B. Each time the Government sought a search warrant from the Court, it demonstrated by clear and convincing evidence through the information contained in the associated probable cause affidavit that serious harm to the investigation would result if the information were publicly revealed.

C. Each time the Government sought a search warrant from the Court, it demonstrated by clear and convincing evidence that there was a serious risk of witness intimidation if the information contained in the associated probable cause affidavits were publicly revealed.

D. The Government's compelling interest in protecting the integrity of its investigation and preventing witness intimidation overrides the public's right of access to the affidavits associated with the search warrants issued in this cause.

E. Each time a defendant entered a plea of guilty to an information in this cause, the information the Government and defense counsel provided, as well as the information contained in associated documents, convinced the Court by clear and convincing evidence that there was a serious risk of witness intimidation if the plea hearing was open

---

**62.** See Gunn, 855 F.2d at 574 (applying a "substantial probability" standard of proof in determining whether the Government had demonstrated that it was proper for the district court to seal the documents in question).

to the public and if the plea hearing transcript and associated documents were publicly revealed.

F. Each time a defendant entered a plea of guilty to an information in this cause, the information the Government and defense counsel provided, as well as the information contained in associated documents, convinced the Court by clear and convincing evidence that there was a serious risk that the Government's ongoing investigation would be compromised if the plea hearing was open to the public and if the plea hearing transcript and associated documents were publicly revealed.

G. As to the defendants who have pleaded guilty in this case thus far, the Government's compelling interest in protecting the integrity of its investigation and preventing witness intimidation overrides the public's right of access to the plea hearings, plea hearing transcripts, and plea agreements.

## VI. *CONCLUSION AND ORDERS*

The undersigned has endeavored to convey the extent and complexity of the Government's investigation which has given rise to the numerous warrants and guilty pleas in this case. In doing so, the undersigned has also explained the necessity for confidentiality in this type of investigation. Briefly, such confidentiality is imperative to preserve the integrity of the Government's investigation and prevent witness intimidation. While confidentiality, and consequently, sealing of proceedings is re-

quired under these circumstances, detailed records of every proceeding are being kept and are subject to review by higher courts. Therefore, the concern with so-called "star chamber"[63] justice or "secret dockets," commonly associated with closed proceedings, are simply non-existent.

In summary, every defendant who has appeared before the Court in this case has done so voluntarily and represented by able counsel. As to warrants, each has been supported by substantial documentation of probable cause. This Court is not asking anyone to "trust me because I say so." Instead, the Court is suggesting that the public should trust the system, because the procedures in place have withstood the test of time. Although we tend to equate transparency with openness, no investigation of this nature and magnitude can proceed unimpeded without the level of confidentiality discussed in this Memorandum Opinion. Under the circumstances, permitting the requested public scrutiny would obliterate the possibility of conducting the investigation.

For the reasons discussed above, the Court enters the following orders:

A. Starr's motion [Rec. No. 59] seeking leave to supplement his original Motion for Leave to Intervene with summaries of two additional cases is **GRANTED.**

B. Starr's motion [Rec. No. 58] requesting an oral hearing on his Motion for Leave to Intervene is **DENIED.**

C. Starr's Motion for Leave to Intervene [Rec. No. 57] is **DENIED,** with the exception that the Court hereby

**63.** "A star chamber is a court that meets in secret and follows arbitrary and harsh procedures. The name is most closely associated with a 17th century court appointed by the English Crown which sat in closed session and pressured the accused in order to uncov-

er uncharged offenses without corroboration." Kevin E. Broyles, *NCAA Regulation of Intercollegiate Athletics: Time for a New Game Plan,* 46 Ala. L.Rev. 487, 504 n. 131 (1995) (internal citations omitted).

ORDERS the District Clerk to post REDACTED versions of the following documents on the Court's CM/ECF system:

1. *As to Defendant Ketner:*

 a. "Order Setting Bond," filed on June 18, 2007;

 b. "Release Order," filed on June 18, 2007;

 c. "Appearance and Compliance Bond," filed on June 18, 2007; and

 d. Minutes for the June 8, 2007, plea hearing.

2. *As to Defendant Flores:*

 a. "Order Setting Bond," filed on July 6, 2007;

 b. "Release Order," filed on July 6, 2007;

 c. "Appearance and Compliance Bond," filed on July 6, 2007; and

 d. Minutes for the July 6, 2007, plea hearing.

3. *As to Defendant Lucero:*

 a. "Order Setting Bond," filed on August 17, 2007;

 b. "Release Order," filed on August 17, 2007;

 c. "Appearance and Compliance Bond," filed on August 17, 2007; and

 d. Minutes for the August 17, 2007, plea hearing.

4. *As to Defendant Cordova:*

 a. "Order Setting Bond," filed on November 28, 2007;

 b. "Release Order," filed on November 28, 2007;

 c. "Appearance and Compliance Bond," filed on November 28, 2007;

 d. Minutes for the November 28, 2007, plea hearing.

5. *As to Defendant Ruiz:*

 a. "Order Setting Bond," filed on December 21, 2007;

 b. "Release Order," filed on December 21, 2007;

 c. "Appearance and Compliance Bond," filed on December 21, 2007; and

 d. Minutes for the December 21, 2007, plea hearing.

6. *As to Defendant Pak:*

 a. "Order Setting Bond," filed on December 21, 2007;

 b. "Release Order," filed on December 21, 2007;

 c. "Appearance and Compliance Bond," filed on December 21, 2007; and

 d. Minutes for the December 21, 2007, plea hearing.

7. *As to Defendant Telles:*

 a. "Order Setting Bond," filed on March 14, 2008;

 b. "Release Order," filed on March 14, 2008;

 c. "Appearance and Compliance Bond," filed on March 14, 2008; and

 d. Minutes for the plea hearing which began on February 15, 2008, and concluded on March 14, 2008.

D. The Court will proceed in this cause consistent with the legal principles set forth in this Memorandum Opinion.

**SO ORDERED.**